## BARRIE J. PETYAN *v.* GRACE ELLIS
### (12644)

PETERS, C. J., SHEA, DANNEHY, SANTANIELLO and CALLAHAN, Js.

Argued January 15—decision released June 17, 1986

*Thomas B. Wilson,* for the appellant (plaintiff).

*James D. Reardon,* for the appellee (defendant).

CALLAHAN, J. The plaintiff, Barrie J. Petyan, brought suit against the defendant, Grace Ellis, a family practice physician, for (1) libel and (2) intentional infliction of emotional distress. After the plaintiff rested her case, the trial court granted the defendant's motion for a directed verdict on both counts and rendered judgment

for the defendant. From this judgment, the plaintiff appeals, claiming that the trial court erred in finding that (1) the defendant had an absolute privilege to publish an allegedly defamatory statement; (2) the publication was not libelous per se; (3) there was no evidence of malice; and (4) there was no evidence of the type of outrageous conduct necessary to sustain an action for the intentional infliction of emotional distress.

Directed verdicts are not favored. *Puro* v. *Henry,* 188 Conn. 301, 303, 449 A.2d 176 (1982). A trial court should direct a verdict only when a jury could not reasonably and legally have reached any other conclusion. *Sestito* v. *Groton,* 178 Conn. 520, 522, 423 A.2d 165 (1979). In reviewing the trial court's decision to direct a verdict in favor of a defendant we must consider the evidence in the light most favorable to the plaintiff. *Pinto* v. *Spigner,* 163 Conn. 191, 192–93, 302 A.2d 266 (1972).

In May, 1980, the defendant placed an advertisement in a local newspaper for a "Medical Assistant-Certified." The plaintiff applied for the position and was hired after she was interviewed by the defendant. Although the plaintiff was not a certified medical assistant at that time, she had completed a two year associate degree course in that discipline at a junior college. Also prior to being hired by the defendant, she had worked for a four-doctor practice as a medical assistant. During the defendant's interview of the plaintiff, the general duties of the position were discussed. Typing, while mentioned, was not emphasized. The plaintiff told the defendant that she could type but said that she was not "top-notch" and was not a "speed typist." Approximately two weeks after the plaintiff began work, the defendant indicated she was dissatisfied with the plaintiff's performance, particularly her typing ability. At the end of the third week, the defendant discharged the plaintiff and gave her an "unemployment

notice" stating the reason for her termination to be "personal." Shortly thereafter the defendant received a "fact-finding supplement" form from the employment security division of the state labor department which included the following language: "If you are unable to attend the scheduled hearing, please enter all pertinent information regarding the reason the above named claimant separated from your employ on 6-27-80." The form contained no date for a scheduled hearing nor was the defendant notified of one. The defendant filled out the form stating that the plaintiff "was released from this employment for reasons of unsatisfactory performance and, mainly for fraud and lying," and returned it to the employment security division.

At the unemployment compensation eligibility hearing, which the defendant did not attend, the plaintiff was shown the "fact-finding supplement" form that had been filled out by the defendant. She testified that she became "quite shook and extremely embarrassed." She also said that for one and one-half years after this occurred "[she] felt betrayed, outraged, extremely upset, began to feel that I didn't have any confidence left. I was afraid to go out and find another job. I thought that this had ruined my reputation forever, and I just couldn't bring myself to answer another ad. I was just so terribly shook."

The plaintiff's first claim is that the trial court erred in finding that the defendant had an absolute privilege to publish the allegedly defamatory statement in the "fact-finding supplement" form. It has long been established that there is an absolute privilege for statements made in judicial proceedings. *Briscoe* v. *LaHue,* 460 U.S. 325, 331–32, 103 S. Ct. 1108, 75 L. Ed. 2d 96 (1983); *Blakeslee & Sons* v. *Carroll,* 64 Conn. 223, 232, 29 A. 473 (1894). There is a "long-standing common law rule that communications uttered or published in the course of judicial proceedings are absolutely privi-

leged so long as they are in some way pertinent to the subject of the controversy." *Circus Circus Hotels, Inc.* v. *Witherspoon,* 99 Nev. 56, 60, 657 P.2d 101 (1983). The effect of an absolute privilege is that damages cannot be recovered for a defamatory statement even if it is published falsely and maliciously. *Hassett* v. *Carroll,* 85 Conn. 23, 35, 81 A. 1013 (1911); *Magnan* v. *Anaconda Industries, Inc.,* 37 Conn. Sup. 38, 43, 429 A.2d 492 (1980), rev'd on other grounds, 193 Conn. 558, 479 A.2d 781 (1984). "The policy underlying the privilege is that in certain situations the public interest in having people speak freely outweighs the risk that individuals will occasionally abuse the privilege by making false and malicious statements." *Circus Circus Hotels, Inc.* v. *Witherspoon,* supra, 61; *Butz* v. *Economou,* 438 U.S. 478, 512–13, 98 S. Ct. 2894, 57 L. Ed. 2d 895 (1978).

"The 'judicial proceeding' to which the immunity attaches has not been defined very exactly. It includes any hearing before a tribunal which performs a judicial function, ex parte or otherwise, and whether the hearing is public or not. It includes for example, lunacy, bankruptcy, or naturalization proceedings, and an election contest. It extends also to the proceedings of many administrative officers, such as boards and commissions, so far as they have powers of discretion in applying the law to the facts which are regarded as judicial or 'quasi-judicial,' in character." Prosser & Keeton, Torts (5th Ed.) § 114, pp. 818–19. This privilege extends to every step of the proceeding until final disposition. Id. "[L]ike the privilege which is generally applied to pertinent statements made in formal judicial proceedings, an absolute privilege also attaches to relevant statements made during administrative proceedings which are 'quasi-judicial' in nature." *Mock* v. *Chicago, Rock Island & Pacific R.R. Co.,* 454 F.2d 131, 133 (8th Cir. 1972); *Thomas* v. *Petrulis,* 125 Ill. App.

3d 415, 419, 465 N.E.2d 1059 (1984); *Richardson* v. *Dunbar,* 95 Ill. App. 3d 254, 256, 419 N.E.2d 1205 (1981); *Circus Circus Hotels, Inc.* v. *Witherspoon,* supra, 61.

In *Magnan* v. *Anaconda Industries, Inc.,* supra, 42, the Superior Court, *Berdon, J.,* held that an employer who discharges an employee has an absolute privilege when supplying the information necessary for the "unemployment notice" required by regulation.[1] The court based its decision on the conclusion that the information is furnished in connection with a quasi-judicial function of an administrative board. That court found that in unemployment compensation proceedings "[t]he administrator, the referee and the review board, including witnesses in proceedings before them, are absolutely privileged to publish defamatory matters provided such statements have some relation to the quasi-judicial proceeding. Other jurisdictions have reached this same conclusion. *White* v. *United Mills Co.,* 240 Mo. App. 443, 451, 208 S.W.2d 803 (1948); *Kitchner* v. *State,* 82 Misc. 2d 858, 860, 371 N.Y.S.2d 91 (1975); annot., 'Defamation-Administrative Proceeding,' 45 A.L.R.2d 1296, 1303." Id., 45.

We agree with the conclusion of the court in *Magnan* and extend its reasoning to include the information supplied by an employer on the "fact-finding sup-

---

[1] "[Regs., Conn. State Agencies] Sec. 31-222-9. UNEMPLOYMENT NOTICES, RETURN-TO-WORK NOTICES, LOW EARNINGS REPORTS AND NOTICE OF LESS THAN FULL-TIME EMPLOYMENT

"All employers whether or not subject to the act shall submit the following reports at the times and under the conditions specified:

"(1) AN UNEMPLOYMENT NOTICE. This notice shall be prepared on forms made up by the administrator and shall contain the information required by such forms and shall be given to the worker immediately upon termination of employment or layoff, whatever the cause of such termination or layoff. This notice shall not be used or required for any purpose other than the filing of a claim for unemployment compensation benefits by the worker. . . ."

plement" form of the employment security division of the state labor department. In the processing of unemployment compensation claims, the administrator, the referee and the employment security board of review decide the facts and then apply the appropriate law. General Statutes §§ 31-241,[2]

[2] General Statutes (Rev. to 1979) § 31-241 as amended by Public Acts 1979, No. 79-187, § 2, provides: "Sec. 31-241. INITIAL DETERMINATION. NOTICE; APPEAL. The administrator, or a deputy or representative designated by him and hereinafter referred to as an examiner, shall promptly examine the initiating claim and, on the basis of the facts found by him, shall determine whether or not such claim is valid and, if valid, the weekly amount of benefits payable and the maximum possible duration thereof. He shall promptly notify the claimant of the decision and the reasons therefor, which notification shall set forth the provision of this section for appeal. The administrator, or deputy or representative designated by him and hereinafter referred to as an examiner, shall promptly examine each claim for a benefit payment for a week of unemployment and, on the basis of the facts found by him, shall determine whether or not the claimant is eligible to receive such benefit payment for such week and the amount of benefits payable for such week. The determination of eligibility by the administrator or an examiner shall be based upon evidence presented in person or in writing at a hearing called for such purpose. Notice of the decision and the reasons therefor shall be given to the claimant. The employers against whose accounts charges may be made due to any benefits awarded by the decision shall be notified of the initial determination of the claimant's benefit entitlement at the time notice is given to the claimant, which notification shall set forth the provisions of this section for appeal, provided any employer who claims that the claimant is ineligible for benefits because his unemployment is due to the existence of a labor dispute at such employer's factory, establishment or other premises, shall be notified of the decision and the reasons therefor, whether or not benefits awarded by the decision might be charged against such employer's account. The employer's appeal rights shall be limited to the first notice he is given in connection with a claim which sets forth his appeal rights, and no issue may be appealed if notice of such issue and the right to appeal such issue had previously been given. The decision of the administrator shall be final and benefits shall be paid or denied in accordance therewith unless the claimant or any of such employers, within fourteen days after such notification was mailed to his last-known address, files an appeal from such decision and applies for a hearing. If the last day for filing an appeal falls on any day when the offices of the employment security division are not open for business, such last day shall be extended to the next business day. Where the administrator or examiner has determined that the claimant is eligible for

31-242³ and 31-249.⁴ The employment security division of the labor department, therefore, acts in a quasi-judicial capacity when it acts upon claims for unemployment compensation.

benefits, benefits shall be paid promptly in accordance with the determination regardless of the pendency of the period to file an appeal or the pendency of such appeal. No examiner shall participate in any case in which he is an interested party. Any person who has filed a claim for benefits pursuant to an agreement entered into by the administrator with the proper agency under the laws of the United States, whereby the administrator makes payment of unemployment compensation out of funds supplied by the United States, may in like manner file an appeal from the decision of such claim and apply for a hearing, and the United States or the agency thereof which had employed such person may in like manner appeal from the decision on such claim and apply for a hearing."

³ "[General Statutes] Sec. 31-242. REFEREE'S HEARING OF CLAIM ON APPEAL FROM EXAMINER: DECISION NOTICES; DISQUALIFICATION OF REFEREE, CHALLENGE. Unless such appeal is withdrawn, the referee shall promptly hear the claim, de novo, and render a decision thereon. Unless he has waived the notice or agreed to a shorter period of time, notice, by mail or otherwise, of the time and place of such hearing shall be given each interested party not less than five days prior to the date appointed therefor. The parties, including the administrator, shall be notified of the referee's decision, which notification shall be accompanied by a finding of the facts and the conclusions of law upon which the decision is based. Such hearing shall be held by the referee designated by the chief referee. No referee shall hear an appeal if he has any interest in the proceeding or in the business of any party to the proceeding. A challenge to the interest of a referee may be made by any party to the proceeding. The decision on said challenge shall be made by the chairman of the board, after proceedings held in accordance with such rules of procedures as the board may establish."

⁴ "[General Statutes (Rev. to 1979)] Sec. 31-249. APPEAL FROM EMPLOYMENT SECURITY REFEREE'S DECISION TO EMPLOYMENT SECURITY BOARD OF REVIEW. At any time before the referee's decision has become final within the periods of limitation prescribed in section 31-248, any party including the administrator, may appeal therefrom to the board. Such appeal shall be filed and may be heard in any local office of the employment security division or, in the case of an interstate claim, in the office in which the claim was filed, or in the office of the appeals referee or the board of review. Such appeal to the board shall be heard on the record of the hearing before the referee, provided if the ends of justice so require, the board may hear additional evidence or testimony. The board may remand the case to a referee for such further proceedings as it may direct. Upon the final determination of the appeal by the board, it shall issue its decision, affirming, modifying or reversing the decision of the referee. In any case in which the board modifies the referee's findings of fact or conclusions of law, the board's decision shall include its findings of fact and conclusions of law."

The statement at issue in the present case was made at the behest of the employment security division on a form it sent to the defendant. The form indicated that, if the defendant was unable to attend the plaintiff's unemployment compensation hearing, the defendant should "enter all pertinent information regarding the reason" the plaintiff was separated from the defendant's employ. The form also contained language that the defendant certified the statement to be true and correct. Although there was no evidence that the "fact-finding supplement" form was required by statute or regulation, that is immaterial. The information that the employment security division requested was solicited by the administrative agency for its official use and the defendant was admonished that it need be "true and correct." There is no reason to believe that the defendant thought this statement would be used for other than administrative purposes. General Statutes § 31-254 specifically states that "[t]he administrator may require from an employer . . . any sworn or unsworn reports with respect to persons employed by him which are necessary for the effective administration of this chapter. Information thus obtained shall not be published or be open to public inspection . . . but any claimant at a hearing before a commissioner shall be supplied with information from such records to the extent necessary for the proper presentation of his claim."

In the present case the defendant's statement concerning her reasons for discharging the plaintiff from her employ was requested by the employment security division in lieu of her live testimony. The statement was obviously pertinent to the purposes of the hearing and was a communication elicited in connection with and made during an administrative proceeding which was quasi-judicial in nature. It was analogous to a pleading or testimony in a judicial proceeding. Viewed in that light, the dictates of public policy require that an

employer involved in an unemployment compensation proceeding be able to state candidly his or her reasons for terminating an employee as long as the employer's statement bears a reasonable relation to the purpose of the proceeding. Otherwise employers might be reluctant to respond to the employment security division at all or their reply might be colored by fear of subsequent litigation or liability. See *Briscoe* v. *LaHue,* supra, 331–32.

Officials of the employment security division have subpoena powers and undoubtedly could have compelled the defendant to attend and testify at the plaintiff's hearing. See General Statutes § 31-245. There is no doubt that her testimony under those circumstances would have been absolutely privileged. It seems incongruous then to accord less than an absolute privilege to her statement which was elicited by the administrative agency for use at the same hearing. The absolute privilege would serve the same purpose in both instances. We recognize that the witness analogy is less than perfect because a witness is required to testify under oath and, therefore, is subject to criminal penalties for perjury, which presumably inhibit falsification. If, however, the "substantial rights of the parties" required it, the defendant could have been summoned to testify under oath and subjected to criminal penalties if she perjured herself. General Statutes §§ 31-244 and 53a-156. There is, of course, no "really effective civil remedy against perjurers"; that lack is "simply part of the price that is paid for witnesses who are free from intimidation by the possibility of civil liability for what they say." Prosser & Keeton, Torts (5th Ed.) § 114, p. 817. The common law absolute privilege itself is not confined to the testimony of a witness but extends to any statement made in the course of a judicial proceeding, whether or not given under oath, so long as it is pertinent to the controversy. Id. Thus it applies

to statements made in pleadings or other documents prepared in connection with a court proceeding. Id.; 1 Harper & James, Torts § 5.22, p. 426. The "fact-finding supplement" in this case, containing the alleged defamatory statement relied upon by the plaintiff, appears to serve the same function in the administrative proceeding before the unemployment security division as that of pleadings and similar documents in court proceedings. The defendant therefore should be accorded the same absolute privilege whether she testifies in person in response to a subpoena or submits her testimony in writing at the request of the administrative agency.

It is true that only qualified immunity exists in some areas that have a connection to the judicial process, particularly where constitutional rights of an individual are concerned. For example, a police officer sued for false arrest under 42 U.S.C. § 1983 has only a qualified immunity; *Pierson* v. *Ray,* 386 U.S. 547, 557, 87 S. Ct. 1213, 18 L. Ed. 2d 288 (1967); a complaining witness who initiates a prosecution and procures the issuance of an arrest warrant has only a qualified immunity at common law and a police officer who submits an affidavit for an arrest warrant has only a qualified immunity for purposes of 42 U.S.C. § 1983. *Malley* v. *Briggs,* 475 U.S. 335, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986). In none of those instances, however, is the factfinding process of a tribunal directly affected. There has been no abrogation, unless by statute, of the common law protection of absolute privilege for communications or testimony elicited in connection with and pertinent to an ongoing judicial or quasi-judicial proceeding.

We hold, therefore, that an absolute privilege exists and the trial court was not in error when it granted the defendant's motion for a directed verdict on this issue. This holding also resolves the plaintiff's claims that the trial court erred in finding that the publica-

tion of the statement was not libelous per se and in finding that there was no evidence of malice. We need not address those claims because our conclusion that there was an absolute privilege bars any recovery by the plaintiff even if we were to conclude that the publication of the statement was libelous per se or that a jury could have found malice.

The plaintiff's final claim is that the trial court erred in directing a verdict for the defendant on the count of intentional infliction of emotional distress. She claims there was sufficient evidence to submit that issue to the jury.

The tort of intentional infliction of emotional distress has been recognized and *Murray* v. *Bridgeport Hospital,* 40 Conn. Sup. 56, 62, 480 A.2d 610 (1984), provides appropriate guidelines for determining whether a successful cause of action will lie. "In order for the plaintiff to prevail in a case for liability under . . . [the intentional infliction of emotional distress], four elements must be established. It must be shown: (1) that the actor intended to inflict emotional distress; or that he knew or should have known that emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe. *Hiers* v. *Cohen,* 31 Conn. Sup. 305, 329 A.2d 609 (1973); 1 Restatement (Second), Torts § 46." *Murray* v. *Bridgeport Hospital,* supra, 62; see *United Services Automobile Assn.* v. *Glens Falls Ins. Co.,* 350 F. Sup. 869, 872 (D. Conn. 1972); *U.S.A. Oil, Inc.* v. *Smith,* 415 So. 2d 1098, 1100 (Ala. App. 1982); *Counce* v. *M.B.M. Co.,* 266 Ark. 1064, 1068, 597 S.W.2d 92 (1980); *Harris* v. *Jones,* 281 Md. 560, 566, 380 A.2d 611 (1977); *Agis* v. *Howard Johnson Co.,* 371 Mass. 140, 145–46, 355 N.E.2d 315 (1976); *Pyle* v. *Pyle,* 11 Ohio App. 3d 31, 34, 463 N.E.2d

98 (1983); *Womack* v. *Eldridge,* 215 Va. 338, 342, 210 S.E.2d 145 (1974); *Sheltra* v. *Smith,* 136 Vt. 472, 476, 392 A.2d 431 (1978); Prosser & Keeton, supra, § 12, p. 54.

The trial court found that there was no evidence from which the jury could reasonably have found that the defendant's conduct was intentional or outrageous and therefore apparently determined that the first and second requirements to sustain a cause of action for the intentional infliction of emotional distress were not proven. We agree with the trial court's conclusion that the defendant's conduct could not be considered outrageous.[5] Regardless of how the defendant's conduct is categorized, however, since her comment in the "fact-finding supplement" was absolutely privileged, she would not be liable for the intentional infliction of emotional distress in any event. See *Deaile* v. *General Telephone Co. of California,* 40 Cal. App. 3d 841, 115 Cal. Rptr. 582 (1974); *Agostini* v. *Strycula,* 231 Cal. App. 2d 804, 42 Cal. Rptr. 314 (1965).

The Restatement of Torts (1948 Sup.) § 46 provides "[o]ne who, *without a privilege to do so,* intentionally causes severe emotional distress to another is liable (a) for such emotional distress, and (b) for bodily injury resulting from it." (Emphasis added.) Although 1 Restatement (Second), of Torts (1965) § 46 does not contain the same reference to privilege, the issue of privilege, in the context of the intentional infliction of emotional distress, is discussed in comment (g): "The conduct, although it would otherwise be extreme and outrageous, may be privileged under the circumstances. The actor is never liable, for example, where he has done no more

---

[5] "[T]he rule which seems to have emerged is that there is liability for conduct exceeding *all bounds* usually tolerated by decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind." (Emphasis added.) Prosser & Keeton, Torts (5th Ed.) § 12, p. 60.

than to insist upon his rights in a permissible way, even though he is well aware that such insistence is certain to cause emotional distress." Since the defendant had an absolute privilege to state her reasons for the termination of the plaintiff's employment in the "factfinding supplement" solicited by the employment security division, she was exercising a legal right in a permissible fashion and cannot be held liable for the intentional infliction of emotional distress. See *Batchelor* v. *Sears, Roebuck & Co.,* 574 F. Sup. 1480, 1489 (E.D. Mich. 1983); *Novosel* v. *Sears, Roebuck & Co,* 495 F. Sup. 344, 347 (E.D. Mich. 1980). The trial court, therefore, did not err when it directed a verdict for the defendant on this count.

There is no error.

In this opinion PETERS, C. J., and SHEA, J., concurred.

SANTANIELLO, J., with whom, DANNEHY, J., joins, dissenting. I respectfully disagree with the result and the reasoning of the majority opinion. The court announces today that employers may intentionally lie on unemployment compensation commission factfinding forms to obtain a chance at reducing their unemployment compensation contributions. I believe that such a result is unwarranted and defeats the purpose of our unemployment compensation laws.

The majority reasons that if the statement was made in the context of a quasi-judicial proceeding, then absolute immunity is required. Although absolute immunity may be necessary in many instances where quasi-judicial proceedings are involved, absolute immunity is not the rule, but rather the exception. In *Blakeslee & Sons* v. *Carroll,* 64 Conn. 223, 234, 29 A. 473 (1894), we held that the rule of absolute immunity should be narrowly limited. Indeed, Professor Prosser, upon

whom the majority relies, wrote that "[a]bsolute immunity has been confined to a very few situations where there has been an obvious policy in favor of permitting complete freedom of expression, without any inquiry as to the defendant's motives." Prosser & Keeton, Torts (5th Ed. 1985) § 114, p. 816.

The court's opinion states that "[t]here has been no abrogation, unless by statute, of the common law protection of absolute privilege for communications or testimony elicited in connection with and pertinent to an ongoing judicial or quasi-judicial proceeding," but this is inaccurate. A number of courts, including the United States Supreme Court, disapprove of blind, blanket imposition of absolute immunity for all persons connected with judicial and quasi-judicial proceedings and have held that qualified immunity is preferable in many instances. In *Butz* v. *Economou,* 438 U.S. 478, 506, 98 S. Ct. 2894, 57 L. Ed. 2d 895 (1978), the Supreme Court held that *qualified immunity* should be applied in cases where a federal official is charged with unconstitutional conduct, unless the official can show that public policy requires absolute immunity be applied in his case. The case involved a civil suit brought against a federal administrative prosecutor, federal agency officials and a group of auditors who each played a part in bringing an administrative complaint against the plaintiff. The court permitted the prosecutor to claim absolute immunity but remanded the case for a determination of whether the auditors and others were entitled to that protection. On remand, the District Court found that the auditors who testified against the plaintiff were only afforded qualified immunity. *Economou* v. *Butz,* 466 F. Sup. 1351, 1363 (S.D.N.Y. 1979), aff'd without opinion, 633 F.2d 203 (2d Cir. 1980); see generally 5 Davis, Administrative Law §§ 27:22, 27:23; see also *Harlow* v. *Fitzgerald,* 457 U.S. 800, 807, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982) (for "executive officers in general . . . qualified immunity represents the norm").

Most telling is the recent case of *Malley* v. *Briggs*, 475 U.S. 335, 344–45, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986), where the court held that a police officer sued under 42 U.S.C. § 1983 is accorded only qualified immunity from suit where he intentionally falsified an affidavit in applying for an arrest warrant. The court stated that the police officer, much like a complaining witness at common law, is not entitled to absolute immunity because his action was more attenuated with the judicial process than that of a prosecutor. Id., 341–42. The court undertook a policy approach weighing the need for absolute immunity under the circumstances.

I would posit that in this case, as in all cases where we are asked to grant absolute immunity, we should balance the need for such protection against the societal costs of affording it. The relevant policy considerations are: the effect that qualified immunity rather than absolute immunity would have on the integrity of the judicial or quasi-judicial process, the possible motives for and frequency of malicious conduct under the circumstances and the need to provide a remedy for wrongful conduct in similar cases. Analyzing these concerns in this case, I feel that qualified immunity (again, the preference) is more appropriate.

Contrary to the majority's assertion, imposing qualified rather than absolute privilege would not impair the ability of the unemployment compensation commission to elicit the facts necessary for a fair determination of benefits. As the United States Supreme Court has written, "the qualified immunity defense . . . provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley* v. *Briggs,* supra, 341. To overcome the qualified immunity defense, the plaintiff must ordinarily show malice, a stiff requirement which will afford an honest employer

all the protection he needs. Thus, an employer will have no reason to fear being candid if qualified rather than absolute immunity were granted. Limiting the likelihood of intentional lies will, if anything, aid the unemployment compensation commission in its search for the truth concerning the reasons for discharge.

The most significant policy concern I have involves the possible motives for lying. Under General Statutes § 31-225a an employer's contribution is linked to the number of his employees receiving benefits. See *Burnham* v. *Administrator,* 184 Conn. 317, 319–20, 439 A.2d 1008 (1981). It is in the employer's own interest, therefore, to intentionally lie that the employee was discharged for cause. This motive, coupled with the usual animosity present between an employer and an employee who was fired, presents a case where intentional lying is more likely. The employer can act with vengeance or discriminatory purpose and the employee would have no recourse. To clothe an employer with absolute immunity would only further encourage such behavior.

The last of the policy factors, that of remedy, also clearly weighs in favor of qualified immunity. We should recognize an employee's right to protect his good name and protect his right to unemployment benefits by granting employers only qualified immunity under these circumstances. As we stated in *Blakeslee & Sons* v. *Carroll,* supra, 235, the doctrine of absolute privilege is flatly inconsistent with the rule that there should be a remedy for every wrong. Furthermore, it would be blatantly unfair to give an employer a free chance at reducing his contribution to the unemployment compensation fund by making it more difficult for his former employee to obtain the benefits to which he is entitled. Indeed, it defeats the purposes of the unemployment compensation act itself. See *Brittany Farms Health Center, Inc.* v. *Administrator,* 177 Conn. 384, 386, 418 A.2d 52 (1979).

The majority attempts to justify the imposition of absolute immunity on the ground that statements made in the commission's factfinding forms are the functional equivalent of "testimony in a judicial proceeding" or "pleadings and similar documents in court proceedings." Such analogies are wanting in several respects. Pleadings are by their nature, *allegations* and are qualified as such. The statements made by the employer in this context are purportedly true and are relied upon by the commissioner in the making of his award. Thus, statements made on the commissioner's factfinding form are potentially much more misleading and damaging than pleadings. As to the testimony of witnesses, the majority concedes that the "analogy is less than perfect because a witness is required to tesify under oath and, therefore, is subject to criminal penalties for perjury," but goes on to argue that the commissioner's subpoena power cures this problem. I fail to see how the power of subpoena will in any way inhibit falsification. The employer still has the opportunity to give a statement "in lieu of testimony" and to misrepresent the reasons for discharge without the fear of either criminal prosecution or civil liability. The fear of being embarassed if subpoenaed will in all likelihood not deter this type of malicious conduct. Thus, the analogy would be appropriate only if the commission made employers subject to perjury under General Statutes §§ 53a-156 and 53a-157 for falsifying the forms.

The idea of granting only qualified immunity to employers in these circumstances is not new. A number of states have passed laws which provide that employer communications to the commission are absolutely privileged "unless the same be false in fact and maliciously written, sent, delivered, or made for the purpose of causing a denial of benefits . . . ." Miss. Code Ann. § 71-5-131; accord Ill. Ann. Stat. c. 48, § 640; Md. Ann. Code art. 95A, § 12 (g); Neb. Rev. Stat.

§ 48-612. Many states have legislatively mandated absolute privilege but only a very small number have done so judicially. See comment, "Unemployment Compensation—Defamation—Required Separation Reports and Liability Based Upon Defamatory Matter Contained Therein," 37 Notre Dame Law. 421, 422 (1962); 45 A.L.R.2d 1296, 1302–1304. Frankly, I do not find persuasive the two out-of-state lower court cases cited by the majority, *White* v. *United Mills Co.,* 240 Mo. App. 443, 208 S.W.2d 803 (1948), and *Kitchner* v. *State,* 82 Misc. 2d 858, 371 N.Y.S.2d 91 (1975). Other states may have considered absolute privilege necessary because their statutes require employers under penalty to file a factfinding report with the commission. See comment, supra, 422. Other states also may not give the employer incentive to lie because they structure contribution payments differently.

In conclusion then, under the equities of this case, I do not believe we should give an employer the freedom to act with impunity where it would open the door to abuse of the administrative machinery designed by the legislature to aid the unemployed. A qualified immunity is preferable here and the plaintiff should be permitted to recover if able to show that the defendant acted with malice. See *Blakeslee & Sons* v. *Carroll,* supra, 238. In this case there was sufficient evidence of malice to submit the issue to the jury. See *Hassett* v. *Carroll,* 85 Conn. 23, 36, 81 A. 1013 (1911). I would accordingly find error in the trial court's ruling on the defendant's motion for a directed verdict.