[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION CT Page 1595
The plaintiff, Basil Cousins, has brought this suit against his stepdaughter, Ladora Ann Urban, alleging that the defendant procured by undue influence a transfer to herself of jointly held property belonging to him and his late wife. The plaintiff alleges that the transfer was the result of coercion and fraudulent cajoling during a period commencing approximately eight weeks before his wife's death from cancer on September 22, 1991. In the third count of his complaint, the plaintiff alleges that the defendant intentionally inflicted emotional distress upon him by causing the issuance of a death notice for his wife that omitted all mention of him and all recognition of their marriage of thirty-six years.
The defendant has filed a counterclaim seeking a partition of the real estate, effective at such time as the plaintiff dies or voluntarily vacates the house.
The evidence paints a picture of a caring family pulled apart by conflicting and intransigent ideas about how to respond to the plaintiff's wife's terminal illness.
The court finds the facts to be as follows. When the plaintiff married Mollie Cousins in 1955, she had a seven year old daughter, the defendant, who was raised in the couple's household. When the defendant was 17, the plaintiff and his wife bought a house in East Haven and moved in with the defendant, who remained with them until, at age 21, she married, and rented the house next door.
Though the plaintiff never adopted the defendant, he referred to her as his daughter and she called him "Dad" until the beginning of the altercations that led to this lawsuit.
The plaintiff and his wife owned their home in joint survivorship and had joint savings and checking accounts. They owned, in both names, a 1986 Buick that was driven exclusively by the plaintiff as his wife did not drive. The plaintiff worked for many years for the railroad, and he retired in 1986, with pension that provided medical benefits supplementary to Medicare. After his retirement, he and his wife spent each winter living CT Page 1596 with the defendant at her home in Florida.
In 1990, Mrs. Cousins was diagnosed as having lung cancer She began oral chemotherapy treatments in Connecticut and continued to receive treatments in Florida when the couple went to the defendant's home as usual in the fall. They returned to Connecticut in April 1991. In June, Mrs. Cousins was ill and resumed treatment for cancer. Because the plaintiff had also had a period or hospitalization after their return to Connecticut, the defendant flew up from Florida to assist. She arrived approximately July 15 and began to talk to Mr. and Mrs. Cousins about her opinion that they should sign their house over to her to avoid losing it to ruinous medical bills. Though he initially entertained this idea and went to see the lawyer recommended by the daughter, the plaintiff later reconsidered and refused to agree to quitclaim his interest in the house to the daughter.
Mrs. Cousins, who was ambulatory and lucid, though lacking in energy, sided with her daughter, as did Mrs. Cousins' sister, who arrived from Florida shortly after the defendant and also stayed in the plaintiff's home. Mrs. Cousins believed her daughter's prediction that the house would be lost, and the plaintiff was unable to convince her or the defendant that this outcome was unlikely because of medical coverage and his supplementary health insurance which paid eighty percent of excess costs. No evidence was presented to suggest that Mrs. Cousins was likely to need a long period of care in a nursing home, surgery, or other expensive treatment.
The family members argued continually about the transfer of property and about whether Mrs. Cousins' medical treatment should take place in New Haven or in Florida. The disagreements were so intense that Mrs. Cousins refused to let her husband share her bed and forced him to sleep on the living room floor. When the plaintiff's brother, William, dropped in during an argument, Mrs. Cousins shared the defendant's view that the house should be signed over to her daughter. The defendant shouted "My mother's only got three months to live and that s.o.b. won't turn the house over" and Mrs. Cousins stated that the plaintiff should do what she and her daughter urged.
On August 6, 1991, the defendant and her mother went to the couple's safe deposit box and removed a savings passbook and title to the car. The defendant arranged a meeting with another lawyer, Murray Trachten, who drew up a quitclaim deed conveying CT Page 1597 Mrs. Cousins' interest in the home to her daughter. Attorney Trachten testified that he spent at least forty-five minutes in Mrs. Cousins' company and that the transfer was her free act and deed.
While visiting the East Haven Town Hall to get a description of the property for the quitclaim deed, Mrs. Cousins signed over title to the jointly owned 1986 Buick to the defendant, who suggested that her signature be witnessed by the notary public at the town hall. The defendant promptly registered the car to herself and her husband in Florida.
The defendant prepared a check, which her mother signed, withdrawing $11,000.00 from the couple's joint savings account, which had a balance of approximately $13,000.00. Mrs. Cousins withdrew $2,500.00 from the couple's checking account.
On August 10, 1991, after all of the above transactions had been completed, Mrs. Cousins asked the plaintiff if she and her daughter and sister could use the car to go to a tag sale. They left in the house some suitcases that they had packed during their threats to go back to Florida, however, they drove to Florida on August 10, stopping overnight in Virginia and arriving at the defendant's home late the next day. The leaving of the packed suitcases was a ruse: they were filled with old clothes and debris.
Mrs. Cousins cancelled the car insurance on the 1986 Buick that had been obtained in Connecticut, and she signed over the refund check to her daughter after forging her husband's name to it. Mrs. Cousins substituted her daughter for her husband as beneficiary on her life insurance policies, the amount of which was not proven.
The plaintiff spoke to his wife by telephone on one occasion in August after she went to Florida. He then changed his telephone to an unlisted number and attempted no further contact.
Mrs. Cousins' condition deteriorated and she was hospitalized in Florida. She died at the defendant's home on September 22, 1991. The defendant did not inform the plaintiff of his wife's death and he learned of it in a roundabout way from relatives. When he checked to see if a death notice had been sent to the New Haven Register, he discovered that the text sent at the direction of the defendant contained no mention of him or CT Page 1598 his wife's marriage and failed to state that she had a surviving husband in East Haven.
When he sought to correct the death notice to avoid the humiliation of such a publication, he was required to prove his identity and establish by documents that he had been married to Mollie Cousins. He eventually succeeded in correcting the death notice before it was published. The defendant has admitted that she intentionally omitted any reference to him in the death notice and that she intended that he be humiliated and distressed.
UNDUE INFLUENCE
The plaintiff's claim in the first and second counts of his complaint is that the defendant procured the transfer to herself of the following property by exercising undue influence over her mother:
1. Mrs. Cousins' half interest in the family home
2. title to the 1986 Buick
3. $11,000.00 from a joint savings account
4. $2,500.00 from a joint checking account
5. $202.09 from a joint insurance refund check
6. proceeds from life insurance policies
Undue influence is the exercise of sufficient control over a person, whose acts are brought into question, in an attempt to destroy his free agency and constrain him to do something other than he would do under normal control. Reynolds v. Molitor,184 Conn. 526, 528 (1981), Pickman v. Pickman, 6 Conn. App. 271, 275
(1986). Relevant considerations have been held to include the age and physical and mental condition of the person whose acts are at issue, whether the person also had independent or disinterested advice in the transaction, consideration or lack of consideration or any contract made, predisposition to make the transfer absent influence, the extent of the transfer in relation to total assets, active solicitation, neglect of others who are the natural object of his bounty, confidence in the person to whom the transfer is made and the relationship of the parties. CT Page 1599 Pickman v. Pickman, supra, at 275-6; Reynolds v. Molitor, supra, at 529.
The hospital records which set forth Mrs. Cousins' medical condition in mid-July 1991 contain numerous descriptions of her distress, fearfulness, and anxiety in the face of recurrence of lung cancer symptoms and the estimation of her doctors that her condition was incurable. She was in a state of great susceptibility at the time the defendant pressed her to transfer her assets. Mr. Cousins revealed himself to be a somewhat taciturn, unemotional person, and his refusal to respond dramatically to his stepdaughters's assessment of what should be done contributed to Mrs. Cousins' acceding to her daughter's plea, which included return to the place where she had been in relatively good health.
Some of the influence exercised by the defendant over her mother must be seen as "due" under the circumstances. Since Mrs. Cousins had no will and no separately held assets, and since her husband had never adopted her daughter, she had reason to think that if she wanted her daughter to receive any property, she must make provision quickly. The feature of the transfer that the court finds to have been "undue" is the wholesale appropriation of almost all of the couple's assets for transfer to her daughter, who appears to have used the plaintiff's refusal to cooperate in the transfer of the house as reason for a campaign against him, which she induced her mother to join. A neighbor who testified indicated that Mrs. Cousins had enjoyed a good relationship with her husband over the many years of her marriage, and there is no reason to believe that, absent the defendant's pressure on her, she would have done anything beyond trying to make a reasonable provision for her only child upon her death. The frenzied campaign to deprive the plaintiff of all of the couple's accumulations over the course of their marriage appears to the court to have been the product of the insistent urging of the defendant at a time when her mother was fearful, suggestible, and upset.
Absent the defendant's vindictive campaign against the plaintiff and her domination of her mother, it appears reasonable to suppose that Mrs. Cousins would have wanted her daughter to have her personal effects (which the defendant has taken) and half of her share of the assets jointly held with the plaintiff, such that she would be dividing her share between the two people closest to her in her life. CT Page 1600
Apart from the house (the value of which was not revealed at trial) the jointly held assets as to which testimony was received had the following value:
 automobile: $ 6,000.00 savings account: 12,902.60 checking account: 2,600.00 insurance refund: 202.09 Total $21,704.69
Assuming that Mrs. Cousins was entitled to half this amount, or $10,852.35, the transfer that this court finds to have been the product of her natural desire to provide or her daughter at the time of her death, rather than the product of undue influence, is $5,426.17.
The court finds that the change of beneficiaries as to Mrs. Cousins' life insurance was also the product of undue influence, however, the uncontroverted evidence was that this amount was spent on burial expenses for Mrs. Cousins. Since the plaintiff would have had to pay such expenses, no transfer is ordered as to such proceeds.
The court finds that the transfer of Mrs. Cousins' undivided half interest in the family home at 25 Meadow Street, East Haven was, likewise, in part a product of the "due" influence of a desire to provide for her daughter and in part a result of the undue influence of the daughter's incensed campaign against the plaintiff. In seeking partition by sale, the defendant has limited her request to a sale upon the death or voluntary vacating of the house by the plaintiff. Accordingly, a judgment of partition of the parties' interest in 25 Meadow Street is hereby ordered, however, the partition shall not take place until the plaintiff's death or voluntary sale of the premises, whichever occurs first, and the defendant's share of the value shall be one quarter of the net proceeds. The property is now unencumbered. Each party shall bear the cost of any encumbrances which he or she causes to be placed on the property. In lieu of rent, the plaintiff shall be responsible for the cost of maintenance between this date and the date of partition, and the parties shall be responsible for the cost of taxes and insurance on the property in the proportion of seventy-five percent by the plaintiff and twenty-five percent by the defendant. CT Page 1601
INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
In Petyan v. Ellis, 200 Conn. 243, 253 (1986), the Connecticut Supreme Court noted that the following guidelines are appropriate for determining whether the tort of intentional infliction of emotional distress has been established: 1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; 2) that the conduct was extreme and outrageous; 3) that the defendant's conduct was the cause of the plaintiff's distress and 4) that the emotional distress sustained by the plaintiff was severe.
The defendant admitted that she intentionally omitted from her mother's death notice all reference to the plaintiff and his status as her mother's husband. The court finds that she both knew that this omission would cause the plaintiff great distress and hoped it would. Because the plaintiff was able to obtain a revision of the notice before it was printed, the defendant's plan did not inflict the full distress intended. The experience of having to prove the existence of his marriage to a skeptical newspaper employee was, however, extremely humiliating and distressing to the plaintiff. The court finds that all of the requirements of Petyan are proven, and that the distress caused by the defendant's purposeful action is fully compensated by an award of damages in the amount of $1,000.00.
The court does not find that all the distress the plaintiff suffered was the result of the defendant's actions. His own cutting off of contact with his wife by changing his phone number and his absence from her deathbed and the death itself no doubt contributed to his distress but this was not caused by the defendant.
CONCLUSION
Half the transfers of personal property made by Mollie Cousins to the defendant are found to have been the result of undue influence, and judgment shall enter in favor of the plaintiff in the amount of $5,426.17 as to Count Two of his complaint. As to Count Three, judgment shall enter in favor of the plaintiff in the amount of $1,000.00.
As to Count One, the court finds that the transfer of the decedent's interest in 25 Meadow Street, East Haven, was only CT Page 1602 partially the product of undue influence. The defendant shall convey to the plaintiff half of her interest in the premises.
As to the counterclaim for partition of the real property, judgment shall enter in favor of the defendant. Partition shall occur upon the occurrence of the plaintiff's death or voluntary vacating of the property, whichever occurs first. The division of the net proceeds shall be seventy-five percent to the plaintiff and twenty-five percent to the defendant. Expenses and encumbrances shall be treated as indicated above.
The plaintiff shall recover his court costs.
Beverly J. Hodgson Judge of the Superior Court