[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The parties to this case own adjoining parcels of real estate in Woodbury. The plaintiff Iris W. Lord brought this action seeking judgment that she has acquired by adverse possession a strip of land between the common boundary of the two properties and a split rail fence approximately six to eight feet from that boundary. She also alleges that the defendants Paul and Pauline Mansfield have intentionally inflicted emotional distress on her in connection with the property dispute and she seeks damages. The defendants dispute the plaintiff's claims and in a counterclaim, ask the court to confirm that the boundary line between the properties is marked by a line of maple trees. They also seek damages for the plaintiff's intentional infliction of emotional distress on them.
Certain facts are not in dispute between the parties. In 1979 the plaintiff purchased property known as 2 Good Hill Road in Woodbury consisting of approximately 1.8 acres of land and a house and barn. Her property is bounded on the easterly side by the defendants' property. In 1962 the defendants purchased property known as 164 Sycamore Avenue, Woodbury consisting of approximately four acres of land and a house and shed. (Sycamore Avenue changes names and becomes Good Hill Road at the plaintiff's property.) The defendants had lived at their property since 1954, renting it until their purchase in 1962.
There is also no dispute that the common boundary of record between the properties is a row of large maple trees which were planted by the plaintiff's predecessor in title, Cornell Stephens. At the time the plaintiff purchased her property in 1979, there was a split rail fence to the east of the row of maple trees, extending from the road in front to the rear, roughly parallel to the trees. It is the property between the maple trees and the fence (the "disputed property") which plaintiff contends she has acquired by adverse possession.
In order to prevail on a claim of adverse possession, the claimant must show by clear and convincing evidence that he or she and predecessors in interest occupied and used the claimed CT Page 4356 property for fifteen years without interruption, exclusively, openly and without consent or permission by the record owner of the land. Roche v. Fairfield, 186 Conn. 490, 498 (1982). Although the period of adverse possession by a predecessor in title may be added to the claimant's period of possession, a doctrine known as "tacking", tacking does not apply where the predecessor's use was not adverse. Marquis v. Drost,155 Conn. 327, 331 (1967). Possession with the consent of the owner can not constitute adverse possession. Loewenberg v. Wallace,151 Conn. 355, 357 (1964).
The plaintiff's burden of proof, one of clear and convincing evidence, is high. She must show that the facts she alleges are "highly probably true, that the probability that they are true or exist is substantially greater than the probability that they are false or do not exist." (Emphasis added.) Dacey v.Connecticut Bar Association, 170 Conn. 520, 537 (1976).
It is undisputed that the plaintiff's predecessor in title, Cornell Stephens, erected a split rail fence on land which belonged of record to the Mansfields. It is also undisputed that Stephens maintained the land between the row of maple trees and the fence by mowing it and that the plaintiff or her agents continued to mow the strip after she acquired title. The defendants contend, however, that Stephens erected the fence in 1964 with the permission of the Mansfields and they presented the testimony of several witnesses in support of this contention. The plaintiff called witnesses who countered the claim. The issue for the court is whether the plaintiff showed by clear and convincing evidence that Stephens' use of the disputed property was without the Mansfields' consent or permission, for the burden of proof on this issue is hers, and not the defendants'.
Paul Mansfield testified that in 1964 Cornell Stephens asked him for permission to put up a fence on the Mansfield property along the row of maple trees. Mansfield testified that he agreed to Stephens' request on the condition that Stephens agree to maintain the fence and the lawn near the fence, which Stephens agreed to do. The Mansfields had eleven children and some of the children drove go-carts in an area of the Mansfield property which was close to the maple trees, leading Stephens to want to protect the trees with the fence. One of the Mansfield sons, who was twelve years old in 1964, corroborated his father's testimony about giving permission to Stephens to erect CT Page 4357 the fence. He testified that he was with his father when the conversation with Stephens occurred.
The defendants also called several witnesses who testified that Cornell Stephens told them that the maple tree line was the boundary between the Stephens and Mansfield properties. William Taff testified that he rented a field on the Mansfield property near the Stephens boundary line for several years in the late 1970's and grew vegetables in the field. He was at the field almost daily and spoke to Stephens frequently, telling him about the pesticides he was using in the garden. Stephens told him "many times," he testified, that the tree line was the boundary and that Paul Mansfield gave him permission to put up the fence. Stephens told this to Taff to explain why Stephens mowed in the area of the fence.
The most impartial of all the witnesses were David Pavlick and Patricia Pavlick, neighbors of both parties who live directly across the street from the Lord property. The Pavlicks testified that they purchased their property in 1974 and shortly after that they visited with Mr. and Mrs. Stephens. The Pavlicks walked the Stephens' property with Mr. Stephens, who told them, "I own up to these maple trees, the property line is the maple trees . . . that's my fence that I put up, but Mansfields allowed me to put the fence up. And it was a split rail fence."
The plaintiff testified that Stephens never told her about the boundary line or the alleged agreement concerning the fence. She also called Eleftherios Stavrakis as a witness. The plaintiff is a licensed real estate broker and Stavrakis, a real estate investor, is a former client. She was his exclusive real estate agent for ten years Stavrakis testified that Lord presented the Stephens property to him and after seeing it, he contracted to purchase it. (He later decided not to purchase the property and he assigned his contract to the plaintiff, who purchased the property.) He testified that Mr. Stephens never told him anything about an agreement with the Mansfields and further told him he had no survey of the property. He testified that Mr. and Mrs. Stephens "indicate that the fence, the little fence was the boundary line . . ." Stavrakis was the only witness who contradicted the testimony of Mr. Mansfield, Taff and the Pavlicks.
In her brief, the plaintiff attacks the credibility of Paul Mansfield's testimony in wholesale fashion. Although there was CT Page 4358 a point in his testimony where Mr. Mansfield, 78 years old as of trial, was confused as to some dates, his testimony as a whole was consistent and credible. Moreover, even if Mr. Mansfield's testimony were entirely discounted, three impartial and credible witnesses, Taff and both the Pavlicks, all testified that Cornell Stephens acknowledged that the maple trees marked the boundary line and that the fence was put up by agreement with the Mansfields. The testimony of these three witnesses was very persuasive to the court.
On this state of the evidence it is clear that the plaintiff has not sustained her burden of proving by clear and convincing evidence that Cornell Stephens' use of the disputed property was without the Mansfields' consent or permission. That failure is dispositive of the plaintiff's adverse possession claim, for without adverse use by Stephens, the plaintiff herself did not use the disputed property for the necessary fifteen years. Furthermore, that failure makes it unnecessary for the court to reach a second issue between the parties, i.e., whether the plaintiff changed the location of the fence when she had it rebuilt in 1990. Judgment is entered for the defendants on the first count of the complaint.
The plaintiff's failure to prove her claim of adverse possession results in the common boundary between the parties being determined in accordance with the deeds of record. The surveyors for both sides agreed and there is no dispute that according to the deeds of record, the boundary line between the two properties is the row of maple trees extending from Good Hill Road/Sycamore Avenue to the brook in the rear of both properties. Accordingly, judgment is entered for the defendants on the first count of their counterclaim that the row of maple trees constitutes the boundary between the Lord and Mansfield properties and that the Mansfields are the owners of the land located east of those trees.
In the second count of her complaint the plaintiff alleges that beginning on June 1, 1993 the defendants harassed and intimidated her in order to deprive her of use of the disputed property. She alleges that the defendants' actions "included the posting of signs and the making of threats to kill both the plaintiff and her dogs" and that the defendants thereby intentionally inflicted emotional distress on the plaintiff. In the second count of their counterclaim the defendants allege that beginning in 1992, when the plaintiff asserted her adverse CT Page 4359 possession claim, she began to harass and intimidate the defendants, including harassing telephone calls throughout the night, complaints to public officials of allegedly illegal activities on the defendants' property and operating her power lawn mower at 1:00 a.m. to disturb the defendants. Both sides seek injunctive relief and compensatory and punitive damages.
Four elements must be proven to sustain a claim of intentional infliction of emotional distress: (1) the actor intended to inflict emotional distress; (2) the conduct was extreme and outrageous; (3) the defendant's conduct was a cause of the emotional distress; and (4) the emotional distress sustained by the plaintiff was severe." Petyan v. Ellis,200 Conn. 243, 253 (1986); DeLaurentis v. New Haven, 220 Conn. 225,266-7 (1991). In determining whether the conduct is extreme or outrageous, the court must be mindful that conduct which is insulting or displays bad manners or results in hurt feelings is insufficient. Mellaly v. Eastman Kodak Co., 42 Conn. Sup. 17, 19
(1991). The defendants must be found to have engaged in conduct which exceeds all bounds tolerated by society. Petyan v. Ellis,
supra, 200 Conn. 254 n. 5. It is the intent to cause injury which is the gravamen of the tort. DeLaurentis v. New Haven,
supra, 220 Conn. 267.
The plaintiff presented evidence at trial which varied from the specific allegations of intentional infliction of emotional distress found in her complaint. The court is guided therefore by the plaintiff's memorandum of law with respect to the specific instances of intentional infliction of emotional distress which she now is pressing.
Although the plaintiff purchased her property in 1979, she did not occupy it until 1989 after her divorce. Until that time, she conducted a quilting business at the property. Initially, the relationship between the plaintiff and the Mansfields was cordial. For example, Mr. Mansfield cared for the plaintiff's dog while Lord was in Europe. In 1992, however, an issue arose about the location of the boundary line. In July, 1992, the Mansfields had their property surveyed in order to determine the correct location of the boundary line. The survey confirmed their understanding that the boundary line was along the row of maple trees. Accordingly, in the spring of 1993, Mr. Mansfield asked Lord to stop mowing the lawn east of the maple trees because that land belonged to the Mansfields. Lord, however, refused to stop mowing the disputed property CT Page 4360 despite the fact that she also had obtained a survey in January, 1993 which showed the location of the boundary line along the row of maple trees, the same location as in the Mansfields' survey. The relationship between the plaintiff and the defendants thereafter became highly acrimonious.
In early July, 1993 the Mansfields put up "no trespassing" signs on the disputed property. The signs were located parallel to the maple trees and in between the trees and the fence. The signs were on stakes which the Mansfields pounded into the ground with a hammer. The plaintiff returned home while the defendants were erecting the signs and with her dog, she rushed over to where the Mansfields were. The plaintiff testified that Mrs. Mansfield struck the dog on the nose with the hammer and told the plaintiff, "If you don't like it, you'll be next." This testimony of the plaintiff was not corroborated by any other witness.
The plaintiff called Brian Hendrix, who was present during this incident, as her witness. He testified that he was too far away to hear any conversation between Lord and Mrs. Mansfield, that he was holding the plaintiff's dog, which was an aggressive dog, about twenty-five feet away and that he did not see Mrs. Mansfield hit the dog with the hammer despite his being there for the entire incident. He did see Mrs. Mansfield shaking the hammer toward Lord, but he did not know if Lord did or said anything to provoke Mrs. Mansfield. Mrs. Mansfield testified that she did not strike the dog with the hammer, that the dog was not near her at that time and that she did not verbally threaten Lord with the hammer.
The court credits the testimony of Hendrix and Mrs. Mansfield about this incident. The plaintiff's version of the incident that Mrs. Mansfield struck the dog and verbally threatened Lord, was uncorroborated. As frequently was the case during the trial, the plaintiff's version of the incident was greatly exaggerated, embellished upon and uncorroborated by other reliable witnesses. During the four days of trial the court had ample opportunity to observe the plaintiff's demeanor. She showed herself to be highly emotional, impulsive, confrontational and even petulant at times. The court found that her recollections of incidents generally were not credible because they were so colored by her emotions.
The second incident of which the plaintiff complains is her CT Page 4361 arrest later in 1993 for harassment of the Mansfields. Shortly after the so-called hammer incident already described, the Mansfields received hang-up phone calls throughout the day and night. They received twenty-seven calls one day from 4:30 p. m. through the night to the next morning. The police were called and a trace was put on the Mansfields' phone which showed that the calls came from Lord's home. In October Lord was arrested on a warrant. She was booked and fingerprinted and had to appear several times in court before the charges were ultimately nolled. The plaintiff testified that she was distressed and humiliated by her arrest and all of the associated events. It is important to note, however, that she did not deny making the phone calls and that her arrest was by warrant signed by a judge who found probable cause for the arrest.
As a matter of law, the plaintiff's arrest cannot give rise to a claim for intentional infliction of emotional distress. InPetyan v. Ellis, supra, 200 Conn. 254-5, our Supreme Court made clear that it is only unprivileged conduct which can constitute intentional infliction of emotional distress. The court quoted the commentary to Restatement (Second), of Torts (1965) § 46: "The conduct, although it would be extreme and outrageous, may be privileged under the circumstances. The actor is never liable, for example, where he has done no more than to insist upon his rights in a permissible way . . ." (Internal quotation marks omitted.) Id. The Mansfields did no more in this instance than report to the police that they were the victims of harassment, a class C misdemeanor. General Statutes § 53a-183. They were pressing their rights in a permissible way and their conduct is therefore not actionable.
The plaintiff also complains of two letters which she received from James Ryan, the Mansfields' attorney. The first letter was written to the plaintiff's attorney and not to the plaintiff while the criminal charges were pending against her. The letter suggests that the criminal matter might be dropped if the plaintiff would withdraw her suit (this action) against the Mansfields, confirm the row of maple trees as the boundary line and agree to have no further contact with the Mansfields. The court does not find that the letter was sent with the intent to inflict emotional distress on the plaintiff nor that the sending of it was extreme and outrageous. The criminal charges arose out of a civil boundary dispute and it was not outrageous to propose a resolution of both criminal and civil charges together. CT Page 4362
The second letter from Ryan was also sent to the plaintiff's attorney and not the plaintiff. The letter advises that the Mansfields will be erecting a privacy fence between their home and the plaintiff's. The letter states, "I have suggested
to them that this fence should not be in the disputed area . . ." (Emphasis added.) The plaintiff evidently took this "suggestion" as a promise and contends that when the Mansfields later erected the privacy fence on their property parallel to the row of maples and within the disputed area it was very upsetting to her. The court does not find the requisite intent nor that the letter and subsequent fence erection were extreme and outrageous. In fact, there have been fewer incidents between the plaintiff and the defendants since the erection of the fence.
The next incident of which the plaintiff complains occurred on or about July 4, 1995 when Mrs. Mansfield was near a large barrel of flowers on the plaintiff's property near the end of her driveway. Both women had cameras and the plaintiff also was operating a tape recorder. The plaintiff testified that Mrs. Mansfield came onto Lord's property and said repeatedly, "Want to eat the camera?" Mrs. Mansfield testified that she was provoked to say that by the fact that the plaintiff put her camera in Mrs. Mansfield's face, within eighteen inches of it, and took pictures of her. Mrs. Mansfield testified that she was very upset when the plaintiff thrust her camera forward and did respond by saying, "Want to eat the camera?" Given the provocation by the plaintiff, the court does not find that the actions of Mrs. Mansfield in response were extreme and outrageous.
The last specific incident claimed by the plaintiff is the defendants' removal of the plaintiff's split rail fence in July 1993. The defendants admit dismantling the fence and stacking the wood near the common boundary line for the plaintiff to retrieve. They removed the fence with police officers in attendance because it was on their property without their permission. Mrs. Mansfield testified that they did not remove it in order to harass the plaintiff. The court finds neither the requisite intent nor that the defendants' actions were extreme and outrageous.
None of the actions identified in the plaintiff's memoranda of law constitute intentional infliction of emotional distress by the defendants. Judgment is entered for the defendants on the second count of the plaintiff's complaint. CT Page 4363
In the second count of their counterclaim, the defendants contend that the plaintiff has intentionally inflicted emotional harm on them by making harassing telephone calls to them during the day and night, by complaining to public officials of illegal activities on their property and by operating her power mower to mow the lawn in the disputed area at 1:00 a.m. In weighing these claims, it is important to recognize that at the time of trial Mr. Mansfield was seventy-eight years old and Mrs. Mansfield seventy-one. The plaintiff, who is considerably younger, was aware at all times that Mr. Mansfield suffered from diabetes, a heart condition and high blood pressure.
The harassing phone calls from the plaintiff to the Mansfields began very shortly after the Mansfields put up the "no trespassing" signs. The calls continued for two days and nights and disrupted the defendants' sleep. Although most were hang-up calls, several times a voice which sounded like the plaintiff's could be heard. The plaintiff has not denied making these calls; a telephone trace showed that they came from the plaintiff's home, where she lives by herself with her dogs. Based on the evidence and reasonable inferences therefrom, the court finds that the plaintiff intentionally inflicted severe emotional distress on both defendants by a series of hang-up phone calls throughout the day and night for two days early in July, 1993, conduct which the court finds to be extreme and outrageous.
The plaintiff also admitted that in August, 1993, after returning from Cape Cod, she decided to use her power lawn mower to mow the disputed property at approximately 12:30 to 1:00 a.m. (The plaintiff testified that she does not usually go to bed until 2:00 a.m. to 3:00 a.m.) She decided to mow the area, she testified, to eliminate harassment by the Mansfields. She went out and mowed for approximately twenty minutes. The Mansfields called the police, who investigated and then gave the plaintiff a summons for simple trespass and creating a public disturbance. The court finds based on the evidence and reasonable inferences therefrom that the plaintiff took this action with the intention of inflicting emotional distress on the elderly defendants, that her conduct was extreme and outrageous and that it caused severe emotional distress to the defendants.
One night in August, 1993 the plaintiff parked her car in her driveway in such a way so that the light from her headlights CT Page 4364 flashing between low beams and high beams, was shining on the Mansfields' house. This was discovered by a police officer on routine patrol in the area.
A more recent incident with lights occurred on June 22, 1996 and was witnessed not only by the plaintiff and the defendants, but also by the Pavlicks, the neighbors who live across the street from the plaintiff. Early in June, 1996, the defendants constructed an eight foot privacy fence on their property alongside the row of maple trees. This prevented the plaintiff from mowing the disputed property and minimized contact between plaintiff and the defendants. At about 12:30 a.m. on June 22, 1996, David Pavlick noticed a bright glow in his bedroom. He got out of bed, got dressed, went outside and looked over to the Lord property, where there were two large floodlights shining over the new fence onto the Mansfields' property. Pavlick observed Lord "scurrying around the yard," going up and down a ladder moving the large floodlights from one position to another and turning them on and off. In an effort to deflect the light, the Mansfields' pickup truck was parked on the side of their house with a section of the new fence propped up in the bed of the truck. The plaintiff's frenzied movement of the spotlights continued until almost 2:00 a.m., when Lord backed her car out of her driveway and positioned it with her headlights shining into the Mansfields' back field where their children or grandchildren had pitched a tent and were camping for the night. Shortly after that, the plaintiff turned the lights out and went inside. The incident was so bizarre, according to Pavlick, that he woke up his wife and took her outside to see it. Despite the Mansfields' attempts to deflect the light, the light entered their bedroom windows, disturbing their sleep. This conduct by the plaintiff was extreme and outrageous and satisfied all other requirements for intentional infliction of emotional distress.
The plaintiff has also made a practice of filing complaints with many public authorities claiming that the Mansfields are conducting illegal activities on their property. She has filed complaints with the police department, the fire department, the Department of Environmental Protection, the Department of Transportation, the health department, the first selectman and others. Most of these complaints appear to be unsubstantiated, but the evidence was insufficient to establish the plaintiff's intention and the frivolous nature of the complaints. CT Page 4365
Mrs. Mansfield also testified that the plaintiff has told many people in the Town of Woodbury that the Mansfields killed her dog, an allegation that is false and upsetting and embarrassing to both defendants, who have been told or questioned about this by as many as eight to ten people. The plaintiff in her testimony did not deny this allegation. The plaintiff's conduct in this regard is intentional, extreme and outrageous and has caused severe emotional distress to the defendants.
Finally, the defendants contend that the plaintiff photographs them and their family and guests on a frequent basis. She also videotapes and audiotapes their activities, which embarrasses the Mansfields and discourages their grandchildren from coming to see them. The plaintiff does not deny these activities and helped prove the defendants' claim by offering dozens of the photographs into evidence at the trial. When her attorney asked the plaintiff why she felt it necessary to make an audio tape, she answered:
 For the simple reason that during my divorce — it stems back to my divorce, and I had hired a private detective, although I didn't have much money to do so, and he said to me what you have to do is you have to have a tape to get the person saying this. And as a result, I was able to finally have the police realize what I was saying was the truth.
 So in my divorce, my stepson was going to take me out. In this case, my — they're [the Mansfields] going to bop my head off, and nobody will be around, and I would be dead. I mean, this is absolutely — how do you think anybody could take it, and the anger, Mrs. Mansfield stating, go on, go on, and Mr. Mansfield, and the . . .
The plaintiff, who apparently is not employed, photographs virtually every visitor to the Mansfield house. The court finds that the plaintiff has intentionally inflicted emotional distress on the defendants by photographing, videotaping and audiotaping their activities and their guests, which is extreme and outrageous conduct that has caused severe emotional distress to the Mansfields.
The plaintiff's conduct since 1992 has been very distressing to the Mansfields. As a result, Mrs. Mansfield has CT Page 4366 developed high blood pressure and angina and is far less active than she once was. Mr. Mansfield has become withdrawn and depressed and physically has declined. Both Mansfields are frequently upset and angry. Their lives have changed significantly as a result of the plaintiff's actions. Some of their grandchildren are reluctant to come visit them because the plaintiff so frequently calls the police to the Mansfield property. They no longer travel in their mobile home visiting one of their daughters, as they once did. They are understandably reluctant to leave their property, worrying about what the plaintiff might do in their absence. The court awards compensatory damages against the plaintiff in the amount of Fifteen Thousand Dollars ($15,000.00) for each defendant, a total of Thirty Thousand Dollars ($30,000.00) in damages. Judgment is entered accordingly on the second count of the defendants' counterclaim.
With respect to the defendants' claim for punitive damages, the court finds that the plaintiff's actions inflicting emotional distress on the defendants were done intentionally, in wanton violation of the defendants' rights and with the knowledge that the defendants were elderly and that Mr. Mansfield suffered from a heart condition and diabetes. An award of punitive damages is warranted and appropriate under these circumstances. Under Connecticut law punitive damages are limited to the prevailing party's litigation expenses less taxable costs. Berry v. Loiseau, 223 Conn. 786, 827 (1992). The court will hold a supplemental hearing on Friday, April 25, 1997 at 10:00 a.m. for evidence about the defendants' litigation expenses.
The court is also entering a permanent injunction in accordance with the defendants' request for relief. The plaintiff, her agents and servants are hereby permanently enjoined from trespassing or entering on the property of the defendants known as 164 Sycamore Avenue, Woodbury, including the disputed property; and they are further enjoined from any and all further acts of harassment against the defendants.
VERTEFEUILLE, J.