[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON THE DEFENDANTS COUNTERCLAIM
This action represents the most recently tried case among a large number of cases between these parties over the past 20 years. Since the plaintiff, Ronald Labow, and the defendant, Myrna Labow, were divorced in 1978, they have engaged in many lengthy, hostile litigations in the trial and appellate courts of Connecticut and New York. The reported and unreported rulings and judgments involving these parties over this time span are too numerous to cite in their entirety, and the following provides only an exemplary listing: Labow v. Labow, 171 Conn. 433 (1976) (on pendente lite orders); Labow v. Valentine, Supreme Court of the State of New York, County of New York, No. 18586/77 (Oct. 21, 1997) (order for Valentine Trust to pay expenses of parties minor children); Labow v. Labow, Superior Court, judicial district of CT Page 3770 Fairfield at Bridgeport, No. 82-0210394 (Aug. 28, 1978) (dissolution decree); Labow v. Labow, Supreme Court of the State of New York, County of New York, No. 16440/70 (April 17, 1979) (on motion to vacate registration of foreign judgment);Labow v. Labow, 449 N.Y.S.2d 977 (1982), aff'd., 466 N.S.Y.2d 304 (1983) (on motion to modify custody); Labow v. Labow,
519 N.Y.S.2d 652 (1987) (reversing imposition of fines against Mr. Labow) Labow v. Labow Superior Court, judicial district of Fairfield at Bridgeport, No. 82-0210394 (Sept. 9, 1995) (modification of dissolution judgment) (Saden, J.), aff'd in part,13 Conn. App. 330 (1988); Labow v. Labow, 550 N.Y.S.2d 889 (1990) (affirming imposition of security for alimony); Rubin v. Labow, Superior Court, judicial district of Fairfield at Bridgeport, No. 79-178886 5 (Feb. 7, 1994) (ruling on motion for summary judgment concerning partition of property previously owned by parties).
The instant action was instituted by the plaintiff in May 1982 as a collateral attack against the divorce judgment that entered in August 1978 dissolving the parties marriage. The case was dismissed and reopened several times, and the case was also scheduled for trial and continued several, times pursuant to motions by one of the parties.
The plaintiffs complaint was in seven counts. The first count alleged that plaintiff did not receive notice of the hearing scheduling the dissolution proceedings for final disposition and that the order of dissolution entered on the basis of inaccurate and false information provided by the Myrna Labow. The second count alleged that "the certified divorce decree failed to conform to the order issued aby the judge. The third and fifth counts alleged that because the divorce judgment entered without notice to Ronald Labow his due process and equal protection rights were violated. The fourth count alleged that Ronald Labow's due process rights were violated because he did not receive notice of the judgment of dissolution until after the appeal period had expired. The sixth count alleged that the courts jurisdictional finding that Myrna Labow had been a Connecticut resident was based on false and inaccurate information and therefore was erroneous. The seventh count alleged that an allocation of child support had not been done despite one of the children reaching majority age.
In addition to this lawsuit, the plaintiff also filed a motion to reopen the divorce judgment. In the motion to reopen the judgment, the plaintiff made the same claims that were made CT Page 3771 in this proceeding collaterally attacking the divorce judgment. After receiving adverse rulings on the motion to reopen, the plaintiff withdrew all of the counts in the instant action except count six. In a decision dated December 16, 1993, Judge Fuller issued a decision in favor of the defendant on this remaining count of the complaint. This disposition of the complaint, however, did not end this litigation because the defendant had filed a counterclaim which was amended in May 1994. The plaintiffs answer to this amended counterclaim was filed in February 1997.
The defendant views herself as a sophisticated, pro se litigant. Indeed, she falsely believes that she has the skills of a trained trial lawyer. Although her lengthy and extensive court appearances over the past 20 years have given her a familiarity and facility with courtroom and evidentiary procedures superior to the average layman, her insistence on representing herself in this case, rather than using her substantial means to retain counsel, has prevented an organized and professional prosecution of this action, as evidenced by the amended counterclaim and the trial proceedings.
The defendant's amended counterclaim is a rambling, convoluted, hodgepodge of grievances which sets forth causes of action which are barely comprehensible. The court entered judgment in favor of the plaintiff and against the defendant on counts two, five, six, and eight of this amended counterclaim. The Second Count failed to assert a separate and distinct cause of action, but made factual allegations supporting the claim of intentional infliction of emotional distress asserted and was considered as part of the Third Count. The Fifth Count was a cause of action for "Outrage"; the Sixth Count was a cause of action for "Nuisance and against Public Policy and Invasion of Privacy"; and the Eighth Count was a separate cause of action entitled "Damages." The remaining claims are for fraud (First Count); intentional infliction of emotional distress (Third Count); vexatious litigation (Fourth Count); and negligence (Seventh Count).
 I FRAUD
Fraud is a deception committed by a person that causes another to suffer a loss or to surrender some legal right. Fraud CT Page 3772 must be proven by clear, precise and unequivocal evidence. "The elements of a fraud action are: 1) a false representation was made as a statement of fact; 2) the statement was untrue and known to be so by its maker; 3) the statement was made with the intent of inducing reliance thereon; and 4) the other party relied on the statement to his detriment." Billington v.Billington, 220 Conn. 212, 217 (1991).
The thrust of the defendants claim for fraud is that the plaintiff failed to truthfully disclose his assets and their value during the divorce proceedings and engaged in a fraudulent course of conduct to deprive her of her ability to realize and enjoy the alimony that had been awarded to her.
 A Claim That The Divorce Judgment Was Fraudulently Obtained
The defendants allegations of fraud during the divorce proceedings primarily concern the truthfulness of the plaintiffs disclosure of his income, assets, and asset values. Contrary to the plaintiffs position, the court concludes that at this point, there can be no question that the plaintiff did not fully disclose his assets and their value during the divorce proceedings. This finding was explicitly made by Judge Saden in his September 9, 1985 decision on the parties cross motions to modify the divorce decree. This finding was upheld on appeal.Labow v. Labow, 13 Conn. App. at 346-348. The parties sharply disagree about what assets were not disclosed, the value of any undisclosed assets, and the manner and extent to which the defendant was harmed by such non-disclosures.
The court concludes that the nature of these issues and the nature of dissolution judgments require such claims to be asserted through a motion to open and modify the divorce proceedings, rather than through a separate action such as this one collaterally attacking the divorce judgment itself. SeeWhelan v. Whelan, 41 Conn. Sup. 519, 521 (1991) ("insofar as the plaintiff contends that a dissolution judgment against her was fraudulently obtained, her remedy is to move to open that judgment in full or in part on the ground of fraud"). To prevail in an action alleging that a marital judgment was secured by fraud, the plaintiff must prove, among other elements, a substantial likelihood that the result would be different and that the granting of such relief will not unfairly interfere with CT Page 3773 interests that have been established on the basis of the judgment. See, Billington v. Billington, 220 Conn. at 212. A courts judgment in a divorce action awarding alimony and dividing the parties assets involves a sensitive evaluation and weighing of a penumbra of considerations controlled by statute. See C.G.S. Secs. 46b-81, 46b-82. Consequently, a claim that an alimony award or a property division would have been made differently but for fraudulent conduct is a matter peculiarly within the province of the court issuing the award.
Moreover, the defendant did in fact move to open and modify the judgment, and during the proceedings on this motion before Judge Saden, all of these claims of fraudulent conduct occurring during the divorce proceedings were raised at that time. Judge Saden took these allegations into consideration when he increased the defendants alimony from $4,500 a month to $4,500 a week, in addition to the other relief granted in her favor. The defendant has not offered any credible: explanation why this court should review these issues again at this time and consider either the granting of relief in addition to what was awarded by Judge Saden or the granting of relief that could have been requested then but was not.
Furthermore, the defendant failed to establish either in this case or in the proceedings before Judge Saden the 1978 value of any assets in dispute or the value of any undisclosed assets, in order to compare this information to the accuracy of the exact representations made by the plaintiff in the divorce action. Certainly, this task was difficult because of the complicated nature of the plaintiffs financial transactions and the time that has passed, but the defendant nevertheless has the burden of proving all the elements of the cause of action. In the instant case, the plaintiff attempted to prove these facts through the testimony of an economist, Dr. Joyce Jacobsen, who relied primarily on extrapolations based on recent information having no credible or probative value to the relevant issues. Dr. Jacobsen's testimony was entirely speculative and incredible.
Therefore, since the claims regarding the divorce proceedings are being resolved on these grounds the court finds it unnecessary to make an explicit finding on the issue whether the plaintiffs failure to disclose fully his assets during the divorce proceedings was done knowingly and for the purpose of shielding his assets from distribution as part of the divorce decree. CT Page 3774
 B Claim of Fraudulent Course of Conduct
The above analysis does not mean that the defendant is precluded from maintaining an action alleging fraudulent or other tortious conduct committed either during or after the marriage that is separate from the claim that the divorce judgment itself was fraudulently obtained. See Delahunty v. Massachusetts MutualLife Ins. Co., 236 Conn. 582 (1996); Whelan v. Whelan,41 Conn. Sup. at 521.
The defendant claims that during and after the divorce proceedings the plaintiff engaged in a course of fraudulent conduct to deprive her of her ability to acquire and enjoy any alimony awarded to her. Again, Judge Saden found that the plaintiff engaged in such conduct and this court agrees. In a scattered and disorganized fashion, the defendant lists a litany of alleged lies and wrongful actions committed by the plaintiff to frustrate her efforts to receive alimony and support. The court relies on the following findings. During the divorce proceedings, the plaintiff created the Valentine Trust, ostensibly for the benefit of the parties minor children. Income and various assets were transferred to the trust. In November 1975, plaintiff transferred to this trust his interest in property owned jointly by the parties and located in Weston, Connecticut. This property was subsequently transferred to a third-party named Rubin. Subsequently, through a series of transfers between 1978 and 1985, the plaintiffs interest in adjoining property located in Fairfield, Connecticut and owned jointly by the parties at the time of their divorce was also transferred to the trust, and subsequently, to Mr. Rubin. Judge Saden found that this trust was "nothing more than a sham front for his own selfish use designed to shield his assets from creditors, such as his ex-wife . . . and others." The defendant has produced no credible evidence indicating that the present, third party owner of the Weston and Fairfield properties was acting under the control of or in concert with the plaintiff as a participant of: any fraudulent scheme. Moreover, she filed no timely action claiming that these property transfers to the trust or to third parties were fraudulent conveyances. See Rubin v.Rubin, supra. The defendants failure to institute actions to invalidate the trust or to have the transfers to the trust invalidated does not negate the sham nature of the trust or its CT Page 3775 improper use by the plaintiff to shield his assets as part of this course of conduct.
After the divorce proceedings, the plaintiff aggressively resisted paying the alimony and support, was held in contempt of court numerous times, and insisted at least from 1978 to 1987 that he was without sufficient funds to pay the support ordered by the divorce decree. However, since 1988, he has not only cured the then existing arrearage, but has also remained fully current on his amended alimony obligation of 4,500 a week. The plaintiff claims he has had to borrow funds to meet these payments and was held in contempt for failure to pay because courts failed to believe that he honestly did not have the ability to pay. The court discounts these claims based on the evidence as a whole and the previous judicial findings. Judge Saden explained how the plaintiff "has over the years employed a large variety of names and devices to obscure his assets" and how the plaintiff has "benefitted [benefited] greatly from the "partnerships" and "associates" and other purported "organizations," which together with the many bank accounts in many banks, [he has] certainly made it difficult to tract the machinations" of [his] mind and operations in his efforts to thwart plaintiff particularly, as well as any other creditors with whom he has had dealings." Thus the court finds that the defendant has shown by clear and convincing that through 1987, the plaintiff engaged in a fraudulent and deceitful course of conduct to avoid his support obligations. The defendant has not met this burden as to any of the actions committed by the plaintiff after 1987.
 II INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
In order for the defendant to prevail on her claim for intentional infliction of emotional distress, she must establish four elements by a preponderance of the evidence: "1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was a likely result of his conduct; 2) that the conduct was extreme and outrageous: 3) that the [actors] conduct was the cause of [her] distress; and 4) that the emotional distress sustained by [her] was severe."Peyton v. Elis, 200 Conn. 243, 253 (1986). "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable CT Page 3776 in a civilized community." Whelan v. Whelan,41 Conn. Sup. at 523
(quoting 1 Restatement (Second), Torts Sec. 46, p. 73 comment (d)).
As part of the defendants claim for intentional infliction of emotional distress, the parties offered extensive evidence about whether or not the defendant has suffered from battered woman syndrome. Battered woman syndrome is a subcategory of post traumatic stress disorder and is a term used to indemnify and characterize the psychological effects that occur to a woman who has been in a battering relationship. A battered woman is a woman who is physically or psychologically abused in an intimate relationship by someone who uses the abuse to control or intimidate her. The abuse usually occurs in a pattern and induces fear and dependency in the victim. The defendants reasoning is that if she has been a "battered woman" and the plaintiff has been a "batterer," then she in turn has been subjected to intentional infliction of emotional distress. Psychologists have established a set of criteria to evaluate whether a persons psychological condition may be associated with battered woman syndrome, as compared to other forms of psychiatric illness or other factors.
In evaluating the defendants claim for intentional infliction of emotional distress, the court has taken into consideration the parties evidence concerning whether the defendant may be characterized as a "battered woman," but for the following reasons the court does not consider it necessary to find explicitly whether the defendant is or is not a person who has suffered from battered woman syndrome. First, the court rejects the defendants reasoning that all persons suffering from battered woman's syndrome also have a cause of action for intentional infliction of emotional distress. This relationship may often exist, but it does not automatically follow in all cases. Battered woman syndrome is not always characterized by actual physical abuse, but may be characterized by actions of emotional intimidation or control which result in psychological abuse or dependency. Stated differently, battered woman syndrome represents a way to identify the psychological effects and chronic emotional dependency of a "battered woman," but it does not define the elements necessary to establish the tort of intentional infliction of emotional distress. These elements are defined by case law and the court must consider whether the facts of the particular case establish these elements, whether these facts involve aspects of battered woman syndrome or not. CT Page 3777
Second, the defendant substantially relies on the testimony of Dr. Stark to establish that she has been a battered woman. The court agrees with the plaintiff that Dr. Stark's testimony is insufficient to establish that the defendant suffered from battered woman syndrome. Dr. Stark heavily relies on events conveyed to him by the defendant which the court, as explained below, does not accept. Additionally, Dr. Stark did not review the defendants extensive hospital records concerning her two involuntary commitments to hospitals for psychiatric care in 1994 and 1995, which casts substantial doubt on the thoroughness and credibility of his testimony.
Whether the plaintiffs conduct, some of which the court has found to be fraudulent, is sufficient to constitute an intentional infliction of emotional distress as defined by case law is a very close question. After careful consideration of the extensive evidence submitted by the parties, the court concludes that the defendant has failed to meet her burden of proof. As explained further below, the court rejects many of the events which the defendant claims were caused by the plaintiff. The remaining claims primarily involve the plaintiffs failure to pay support, and although offensive and wrongful in many respects, they do no rise to the level of being so extreme and outrageous that they may be regarded as being utterly inimical to civilized society or behavior. Additionally, the nature of the plaintiffs actions and the severity of the stress caused to the defendant must be considered in light of her personality make up which have paranoid and delusional characteristics.
The defendant has had a history of psychiatric intervention or therapy both before and after her marriage with the plaintiff, including two involuntary commitments. The medical records of her commitments at the Metropolitan Hospital and the Mt. Sinai Hospital suggest a diagnosis of a delusional disorder. A delusional disorder, as compared to a psychotic disorder, does not necessarily involve bizarre behavior or a disengagement from reality. For a person suffering from a delusional disorder, real events can cause exaggerated or delusional responses, particularly around the subject matter of the delusion. The delusional system under which the defendant suffers concerns becoming destitute or having insufficient funds to pay her bills or to take care of herself. Her attitude has become fixated with her ex-husband and her obsessiveness for litigation arises from her need to assuage her persecutory feelings. This is not to say CT Page 3778 that the plaintiffs conduct has not caused her stress or has not adversely contributed to her condition. The point here is that in objectively evaluating whether the plaintiffs conduct is "extreme and outrageous" and has caused "severe emotional distress," it is necessary to consider that there may be a delusional or exaggerated aspect to the defendants view of events and the self-reporting of her reactions to these events.
One of the most serious allegations made by the defendant to support her claim of intentional infliction of emotional distress involves her involuntary commitments. She alleges that she was not suffering from any emotional difficulties at all and that the plaintiff conspired with their daughter, Sabrina, to have her committed in order to take her money and sell her New York home. This conspiracy between the plaintiff and Sabrina also involved the doctors who participated in either the commitment authorizations or her treatment. The evidence establishes that the defendants conspiracy theory is pure fantasy.
In or about July 1994, the defendant became extremely upset about having to pay $50,000 in legal fees associated with an assessment on her New York co-op, although she had ample money to pay the bill. On August 8, 1994, soon after paying the bill, she called the police because she thought someone had broken into her apartment. The police were so concerned about her behavior that they took her to Metropolitan Hospital. A day later, Sabrina came from California to New York to be with her mother. Both Sabrina's testimony and the hospital records indicate that the defendant was distraught, incoherent, and complaining about money and her inability to pay her bills. Her apartment was in total disarray. At this time, the defendant had well over $1 million in cash, and was receiving substantial investment income, as well as $235,000 per year in alimony. The defendant remained at Metropolitan Hospital for three days before Sabrina arranged for her to be transferred to Mt. Sinai with the plaintiff's assistance. The defendant remained at Mt. Sinai until September 16, 1994. Subsequently, the New York court appointed Sabrina as guardian for the defendant.
On May 10, 1995, Ms. Labow went to see her doctor, Dr. Edgar, at Mt. Sinai Hospital. Dr. Edgar became concerned about her behavior and decided to recommit her. She remained at Mt. Sinai until June 7, 1995. The defendant subsequently acquired a court order terminating the guardianship. She also sued Sabrina, the plaintiff and Mt. Sinai staff alleging that they participated in CT Page 3779 a conspiracy against her. These claims were dismissed.
Despite the defendants claims to the contrary, the medical records of Metropolitan and Mt. Sinai hospitals clearly establish that the defendant was suffering from severe, emotional disorders, although it appears that no clear diagnosis was definitively established. Various diagnoses were considered, including: delusional disorder, paranoid type; schizoaffective disorder-depressed; organic delusional disorder; personality disorder with schizoid and obsessive traits.
Another serious allegation made by the defendant is that the plaintiff instituted an action in 1980 to obtain custody of their then minor son, Stephen. She claims that this action was instituted without basis and solely to harass and vex her. Stephen's trial testimony totally refutes this claim. He testified that although he was young at the time, he did not want to live with her and asked his father to start the change of custody proceedings. Indeed, the most moving and revealing testimony of the trial came from the defendants children, Sabrina and Stephen. They both testified that they had led unhappy lives with their mother. Stephen particularly testified about how she did not care for him as a child or provide him with love or attention because she was only concerned about getting money for herself They did not corroborate her claims that during the marriage that she was subjected to "gas light" games, received a broken toe after being pushed by the defendant, or suffered the other events of abuse contributed to the plaintiff by the defendant. They both testified, however, that the defendant was an erratic, irrational, obsessed individual.
The defendant testified that the plaintiff raped her during the parties marriage. The court finds no credibility to this claim which was first made in this litigation in 1994 after she had filed three prior counterclaims without asserting this claim.
The defendant acquired a court order for the Valentine Trust to provide her funds for the benefit of the children. Between 1977 and 1983, the trust distributed more than $340,000 to the defendant for the benefit of the children. In September 1980, the trustee, Mr. Valentine, acquired a court order requiring the defendant to provide an accounting of the funds that she received. There was nothing outrageous or vexatious about this request for an accounting. Moreover, there is no credible or probative evidence establishing that the plaintiff directed CT Page 3780 Valentine to seek the accounting.
In 1985, two former attorneys for Ms. Labow obtained judgments against her for unpaid legal fees. These judgments were purchased by Mr. Labow's former attorney, Mr. Joblin, who executed upon accounts of Ms. Labow to satisfy the judgments. Despite the unusual nature of these transactions, no credible evidence was provided by the defendant indicating that the plaintiff was a beneficiary of or participant in Joblin's actions. The executions themselves were contested by the defendant and upheld by the court. See Joblin v. Labow,33 Conn. App. 365 (1993), cert. denied, 229 Conn. 912, (1994); Mal v.Labow, 33 Conn. App. 359 (1993), cert. denied, 229 Conn. 912
(1994).
In summary, the defendant has been obsessed and fixated by the trauma of her divorce and her litigation crusades to such an extent that she associates the plaintiff with virtually all the negative events and significant problems that she has experienced over the last 20 years without regard to the reasonableness or rationality of this association. Virtually all contested dissolutions of marriage involve the infliction of emotional distress, and being the victim of fraudulent conduct will also inflict emotional distress as well. Nevertheless, the credible evidence about the plaintiffs conduct here does not establish behavior that is so outrageous or extreme "as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Whelan v. Whelan,41 Conn. Sup. at 523.
 III VEXATIOUS LITIGATION
In order to prevail on a vexatious litigation claim, the defendant must prove the following by a preponderance of the evidence: lack of probable cause, malice and a termination of suit in the defendants favor. Vandersluis v. Weil, 176 Conn. 356
(1978). Additionally, the defendant has also demanded relief under General Statutes Section 52-568:
 Any person who commences and prosecutes any civil action or complaint against another, in his name or the name of others, or serves a defense to any civil action or complaint commenced and prosecuted by another 1) without probable cause, CT Page 3781 shall pay such other person double damages, or 2) without probable causes and with a malicious intent unjustly to vex and trouble such person, shall pay him treble damages.
Probable cause may be defined as the knowledge of facts or information sufficient to justify a belief by a reasonable person that there are grounds for instituting a lawsuit. A lack of probable cause may allow an inference that malice exists. However, the absence of probable cause cannot be inferred from the fact that malice exists. See Vandersluis v. Weil,176 Conn. at 356. Malice may be described as an intent to vex, harass or annoy the victim and may be express or implied. See BridgeportHydraulic Co. v. Pearson, 139 Conn. 186 (1952).
The defendants amended counterclaim alleges that the complaint filed against her in this case constitutes vexatious litigation. As previously stated, the allegations of the plaintiff's complaint were either withdrawn or resolved in the defendants favor, and therefore, the first element needed to establish vexatious litigation has been established. Whether there was probable cause for the filing of these claims, particularly in a motion to reopen the divorce decree and in this collateral attack on the divorce decree, is also a close question. The court resolves the issues of probable cause and malice by crediting the plaintiffs testimony that he instituted the matters in good faith to litigate legitimate issues raised by the divorce judgment and that he relied on the advice of counsel in this regard who were aware of the factual circumstances. Vandersluis v. Weil,176 Conn. at 361.
 IV NEGLIGENCE
To prevail on a claim of negligence the plaintiff must prove by a preponderance of the evidence that the plaintiff breached a duty of care owed to her, she sustained actual injury, and the plaintiffs breach was the proximate cause of the injury. See RKConstructors, Inc. v. Fusco Corp., 231 Conn. 381, 384 (1994).
The only claim of negligence assert by the defendant separate from her allegations of intentional infliction of emotional distress is that sometime during the marriage, the plaintiff pushed her and caused her to break a toe. The plaintiff denies this claim and the court finds that the defendants evidence about CT Page 3782 this claim which took place over 20 years ago lacks credibility. Similarly, the defendants claims of "negligence per se" have no applicability to the evidence or claims asserted in this case.
 V DAMAGES
A plaintiff in a fraud action is entitled to recover any consequential damages resulting directly from the fraud including damages for emotional distress if the actor should have realized that the conduct involved an unreasonable risk of causing emotional distress and that the distress, if caused, might result in illness or bodily harm. Kilduff v. Adams. Inc., 219 Conn. 314,326 (1991). Whereas the substantive elements of fraud must be proven by clear and convincing evidence, damages for fraud must be proven by a preponderance of the evidence. Id.
The plaintiff has failed to show the value of any actual pecuniary losses caused by the plaintiffs conduct. As discussed previously, the court has rejected as wholly speculative and incredible the testimony of the defendant's economist, Dr. Jacobsen, on this issue. Moreover, the plaintiff has cured all arrearages associated with the court ordered support awards as a result of previous orders acquired by the defendant, and importantly, these arrearages were made without the plaintiff receiving credit for the substantial sums paid to the defendant from the Valentine Trust. Judge Saden indicated in his decision on the parties cross motions to modify that as a result of the plaintiff's wrongful creation and use of the Valentine Trust, the arrearage calculation was done without giving the plaintiff any credit for the Valentine Trust distributions to the defendant.
The court finds that under the circumstances of this case, damages for emotional distress are recoverable for the plaintiff's fraudulent conduct. Id. The defendant claims that loss of life's enjoyment should be the measure for her claim for emotional distress, and she demands $693,000,000 in damages based on the testimony of her expert witness, Dr. Jacobsen. This demand is substantially based on Dr. Jacobsen's reasoning that as a result of the plaintiffs conduct, the defendant has lost 24 hours of life's enjoyment every day for the past 23 years at the rate of $300 an hour, representing approximately $60 million. This $300 is based on Dr. Jacobsen's view that the defendant has acquired so much litigation experience that the defendants time should be CT Page 3783 valued according to the hourly rate of New York trial attorneys. The court rejects this testimony as being totally ludicrous and incredible. The mere offering of such a measure of damages obviously evidences the vast distance between the defendant and any trained attorney.
After a review and consideration of the evidence, the court awards compensatory damages of $45,000 for the emotional distress caused to the defendant by the plaintiff's fraudulent course of conduct.
The defendant has also made a claim for punitive damages. Although she was informed as part of evidentiary rulings that punitive damages under Connecticut law are compensatory and measured by the costs of the litigation, the defendant has proceeded to seek punitive damages by relying on inapplicable law that bases such an award on punishment and deterrence factors. Based on the evidence and the defendant's demands, the court does not award punitive damages.
 CONCLUSION
Therefore, for all the foregoing reasons, judgment enters in favor of the plaintiff on all counts of the amended counterclaim except for the First Count. Judgment enters in favor of the defendant and against the plaintiff on the First Count of the amended counterclaim for $45,000.
Dated this 15th day of March, 1999.
Stevens, J.