Kenneth J. BROWN, Plaintiff,

v.

NORTHEAST NUCLEAR ENERGY CO., Defendant.

No. 3:98CV405 (JBA).

United States District Court, D. Connecticut.

Sept. 25, 2000.

Ronald E. Lasky, Ronald E. Lasky & Associates, New London, CT, Michael J. Melly, New London, CT, for Kenneth J. Brown, plaintiff.

Duncan Ross MacKay, Alicia B. Davenport, Northeast Utilities, Hartford, CT,

Edward M. Richters, Jackson, Lewis, Schnitzler & Krupman, Hartford, CT, for Northeast Nuclear Energy Co, defendant.

## RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DOC. # 40]

ARTERTON, District Judge.

This diversity action arises from defendant Northeast Nuclear's decision to deny plaintiff Kenneth Brown's unescorted access to its Millstone Nuclear Power plant and its subsequent decision to revoke his security clearance thereby resulting in his termination from Cataract.

On March 31, 1999, the Court granted Defendant's motion to dismiss Count One (Fourteenth Amendment claim), Count Two (enforcement of federal regulations), and Count Nine (third party beneficiary breach of contract claim) for failure to state a claim, but denied Defendant's motion to the extent it contended that Plaintiff's state law claims were preempted by federal statutes regulating nuclear safety. The Court reserved decision until summary judgment whether defendant could show the imposition of state common law liability would conflict with the federal nuclear regulatory scheme. In this motion, Northeast Nuclear moves for summary judgment on the remaining state law claims: 1) intentional interference with contractual relations; 2) negligent infliction of emotional distress; 3) intentional infliction of emotional distress and 4) breach of implied contact and 5) defamation by false light. *See* Doc. # 40.

For the following reasons, summary judgment is granted on the remaining claims.

### Factual Background

Plaintiff Kenneth Brown, a resident of Kennesaw, Georgia was employed by Cataract, Inc. ("Cataract"), a subcontractor for Northeast Nuclear Energy Co. Under the terms of his employment contract with Cataract, he was assigned to work at Northeast Nuclear Energy Co.'s Millstone Nuclear Plant located in Waterford, CT. His contract with Cataract included a "Fitness for Duty" clause requiring him to "be fit for duty at any time that access to a nuclear site is requested" and warning "[a]ny time an employee tests positive for alcohol or drugs he/she runs the risk of having their [sic] access denied or revoked ... [and] can result in denial of access at future nuclear facilities for 3–5 years." Although plaintiff does not claim the existence of a written contract with Northeast Nuclear, he alleges an implied contract with Northeast Nuclear by virtue of Northeast Nuclear's Fitness For Duty Manual.

Northeast Nuclear maintained its "Fitness for Duty Manual" (FFDM) in compliance with the Nuclear Regulatory Commission's regulations governing nuclear power licensees, 10 C.F.R. Part 26. The FFDM sets forth the policies and procedures Northeast Nuclear has designed to ensure the "fitness for duty" of its employees as well as its independent contractors. It outlines in detail the procedures for investigating an individual suspected of alcohol and/or drug use. First, the employee should if practical be observed by at least one supervisor, medical or security personnel. The employee should be asked for an explanation of the observed findings that suggest that the employee is not fit for duty. Next, the employee should be taken to a collection facility for "For Cause" testing. If the employee refuses to go, the employee should be taken home and notified that his or her refusal to undergo testing will result in an "administrative positive" equivalent to a positive test result.

Northeast Nuclear revoked Mr. Brown's security clearance based on the events of October 28, 1996. On that date, Mr. Brown reported to work at the Millstone facility after an early morning flight from Georgia. At the time, he was feeling ill. Mr. Norman Williams, a security guard also subcontracted by Northeast Nuclear,

stopped him at the security checkpoint on his belief that he smelled alcohol on Mr. Brown's breath. Mr. Brown stated to Mr. Williams he was feeling ill. Mr. Brown alleges that Mr. Williams failed to comply with the Fitness for Duty Manual requirements by: 1) not demanding that Mr. Brown remain at the checkpoint, 2) not arranging for a supervisor, medical or security personnel to observe or evaluate Mr. Brown, 3) not asking Mr. Brown for an explanation, 4) not escorting Mr. Brown directly to the collection facility for evaluation, and 5) not informing Mr. Brown that he was required to take an alcohol test and the consequences of failing to do so. Although Northeast Nuclear has proffered Mr. Williams' testimony that he told Mr. Brown to remain, Mr. Brown disputes this. In a motion for summary judgment, the Court must construe all facts and inferences in the plaintiff's favor and therefore assumes for purpose of this motion that Mr. Brown was never informed he was required to remain at the checkpoint. Thereafter, Mr. Brown attempted to call his supervisor, Mr. Przekop for his observation of plaintiff's condition. In Mr. Przekop's absence, Mr. Brown's colleague, Mr. Clotfelter observed his condition and detected no smell of alcohol. Soon after, Mr. Brown returned to Mr. Williams and told him he would be going to see a doctor, and consulted with one several hours later. The doctor diagnosed Mr. Brown with shingles, and did not observe any trace of alcohol. Thereafter, Mr. Brown returned to his hotel room in Connecticut. Later that day, Northeast Nuclear notified Mr. Brown's employer Cataract that his security clearance was revoked. Subsequently that day, Cataract informed Mr. Brown that his unescorted access had been revoked.

Pursuant to federal regulations, the identity of persons denied unescorted access to nuclear facilities must be "made available" to all such facilities and contractors. Northeast Utilities, like other nuclear facilities in the country, utilizes the Personal Access Data System ("PADS") to maintain and disclose this background information. Once Mr. Brown's security clearance was revoked, his entry in PADS was updated to reflect the fact that "additional information" was available; upon inquiry by member utilities, accompanied by Mr. Brown's signed consent form, they would be notified that he had been denied unescorted access at Millstone. Since this change, Mr. Brown has applied and been granted unescorted access at two separate nuclear facilities. Brown Dep. at 227–229.

On October 31, 1996, Mr. Brown appealed this unfit finding and on November 25, 1996, Northeast Nuclear notified him of its conclusion that he would be denied unescorted access to the Northeast Nuclear for 365 days. On November 18, 1997, Mr. Brown requested reinstatement of his security clearance and expungement of his record, but reinstatement was denied.[1] This suit followed.

### Standard

Summary judgment is now appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When viewing the evidence, the court must "assess the record in the light most favorable to the non-movant and ... draw all reasonable inferences in [the non-movant's] favor." *Weinstock v. Columbia*

---

**1.** The reason for this denial is not clear, but according to defendant, security clearance cannot be applied for or granted unless the applicant has a job that requires such access.

9(c)(1) Statement, ¶ 60. Plaintiff's 9(c)(2) Statement does not dispute this characterization.

*Univ.*, 224 F.3d 33 (2d Cir.2000). Summary judgment represents, as the Second Circuit has recently reiterated the point at which the non-movant must "put up or shut up." *Weinstock*, 224 F.3d 33, 41, *citing* Fleming James, Jr. & Geoffrey C. Hazard, Jr., Civil Procedure 150 (2d ed.1977).

## Discussion

## I. Tortious Interference with Contractual Relations

Mr. Brown claims that Northeast Nuclear, by revoking his unescorted clearance access for his alleged failure to remain on the premises and reporting such false information to Cataract, tortiously interfered with his contract of employment with Cataract, since Northeast knew the consequence of its revocation would result in his termination.

█ Under Connecticut law, a claim for tortious interference with contractual relations requires a plaintiff to establish the following: (1) the existence of a contractual relationship; (2) the defendant's knowledge of that relationship; (3) the defendant's intent to interfere with that relationship; (4) a tortious interference; and (5) damages caused by the defendant's conduct. *See Collum v. Chapin*, 40 Conn.App. 449, 452, 671 A.2d 1329 (1996). In its motion for summary judgment, Northeast Nuclear does not dispute Mr. Brown had a contractual relationship with his employer, Cataract, that Northeast was aware of this employment contract, or that Mr. Brown was adversely affected by its reporting of his failure to take a drug test, but instead contends there is no evidence that Northeast Nuclear's intention was to interfere with Mr. Brown's employment with Cataract and that its conduct was tortious or otherwise improper. The Connecticut Supreme Court has noted that:

> "not every act that disturbs a contract or business expectancy is actionable.... [F]or a plaintiff successfully to prosecute such an action it must prove that the

defendant's conduct was in fact tortious. This element may be satisfied by proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation ... or that the defendant acted maliciously.... [A]n action for intentional interference with business relations ... requires the plaintiff to plead and prove at least some improper motive or improper means.... [A] claim is made out [only] when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself."

*Robert S. Weiss & Associates, Inc. v. Wiederlight*, 208 Conn. 525, 535–36, 546 A.2d 216 (1988) (internal citations omitted).

Therefore, to prevail on his claim, Mr. Brown is required to demonstrate some improper motive or improper means. In opposition, Plaintiff asserts that Northeast Nuclear's malicious intent to interfere with his employment relation can be reasonably inferred from Northeast Nuclear's conduct in revoking his security clearance the day after the incident without any investigation whatsoever even though it knew he had been legitimately concerned about his health and that such revocation would negatively affect his employment. He contends that if the jury credited his account that Mr. Williams never told him to remain on site, that Northeast Utilities believed or knew that he was never told to remain on the site, but nonetheless told Cataract that he failed to remain on site, Northeast's reporting could be found improper since it would be without justification.

█ The Court recognizes that where intent, motivation or state of mind is at issue, the Second Circuit has admonished that "summary judgment should be used sparingly." *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir.1988); *Gallo v. Prudential Residential Services LP, Inc.*, 22 F.3d 1219, 1224. While determination of intent may generally be a factual matter, "the mere incantation of intent or state of mind [does not] operate as

a talisman to defeat an otherwise valid [summary judgment] motion ... [Rather] '[t]he state of mind exception ... is appropriate only where solid circumstantial evidence exists to prove plaintiff's case.'" *Citizens Bank of Clearwater v. Hunt,* 927 F.2d 707, 711 (2d Cir.1991). While there is certainly a dispute of fact as to whether Mr. Williams told Mr. Brown to remain, there is no evidence creating a dispute of fact as to whether Northeast Nuclear believed or knew that Mr. Brown was not told to remain. Rather the evidence indicates Northeast Nuclear concluded after investigation that Mr. Brown had been informed that he needed to remain. If for example, Mr. Brown had proffered any evidence from which it could be inferred that Northeast Nuclear in fact believed or should have known that plaintiff had never been directed to remain on the scene to be tested, or that it held Mr. Brown in ill-regard for some unrelated reason at the time it disregarded his explanation of "mis-communications," then Northeast Utilities' motive or intent would be properly a triable issue of fact. However, absent any evidence that Northeast Nuclear did other than credit its security supervisor's account of events over Mr. Brown's when reporting to Cataract, its motive or intent with respect to its report conclusion has not been put in issue.

Accordingly, summary judgment is GRANTED on plaintiff's claim for tortious interference with his employment contract.

## II. Intentional Infliction of Emotional Distress

Mr. Brown's claim for intentional infliction of emotional distress is also premised on Northeast Nuclear's failure to follow its procedures regarding its belief he had been using alcohol, failure to order him to remain on-site to be observed and/or tested, conclusion that he was administratively positive and reporting of such result to PADS.

To state a claim for intentional infliction of emotional distress, the plaintiff must allege: 1) that the actor intended to inflict emotional distress; or knew or should have known that emotional distress was the likely result of its conduct, 2) that the conduct was extreme and outrageous, 3) that the defendant's conduct was the cause of the plaintiff's distress, and 4) that the emotional distress sustained by the plaintiff was severe. *See Petyan v. Ellis,* 200 Conn. 243, 253, 510 A.2d 1337 (1986). Ordinarily, the disputed conduct must exceed all bounds tolerated by decent society, not be merely rude, tactless or insulting. *See Petyan,* 200 Conn. at 254, 510 A.2d 1337 (1986). "[A] line can be drawn between the slight hurts which are the price of a complex society and the severe mental disturbances inflicted by intentional actions wholly lacking in social utility." *Whelan v. Whelan,* 41 Conn.Supp. 519, 522, 588 A.2d 251 (1991). Under Connecticut law, it is for the court to make an initial determination of whether the alleged misconduct meets the threshold requirements of outrageousness. *See Appleton v. Board of Education of Town of Stonington,* 254 Conn. 205, 757 A.2d 1059 (2000).

In opposition, Mr. Brown claims that Northeast Nuclear's failure and refusal to honor its own procedures exceeds the level needed to give rise to a disputed issue of fact on whether its conduct was extreme and outrageous. Mr. Brown points to several other cases where Connecticut superior courts have found the requisite outrageousness in an employer's conduct. However, this case of procedural deficiencies, outside any employment relationship between Northeast Nuclear and Mr. Brown and dissimilar in degree, kind or nature to the cases relied on, requires the conclusion that no reasonable jury could properly find Northeast Nuclear's conduct extreme and outrageous. *Compare Brown v. Ellis,* 40 Conn.Supp. 165, 167, 484 A.2d 944 (1984) (denying summary judgment where employer assigned employee to per-

form work at great heights, knowing of the employee's fear of heights); *Mellaly v. Eastman Kodak Company,* 42 Conn.Supp. 17, 597 A.2d 846 (1991) (denying motion for summary judgment where employer taunted employee about his alcoholism and recovery).

■ Therefore, Northeast Nuclear's motion for summary judgment on Mr. Brown's claim of intentional infliction of emotional distress is GRANTED.

### III. Implied Contract

Mr. Brown's implied contract claim is based solely on Northeast Nuclear's fitness for duty manual, which states in pertinent part:

> The FFD program applies to all Northeast Utilities employees, applicants, contractor and vendor personnel who have unescorted access to nuclear station protected areas or who are required to report to emergency response facilities as a member of a site emergency response organization.

FFDM at 7–12, Def.'s Ex. 3.

■ While Mr. Brown does not claim any employer-employee relation or other direct contractual relationship between himself and Northeast Nuclear and readily admits he was employed solely by Cataract, he claims an implied contract arose by virtue of the fact that Mr. Brown worked at defendant subject to the Manual's terms and was well aware from his extensive experience in the nuclear energy field of, and complied with, defendant's fitness for duty requirements. However, Mr. Brown proffers no facts or circumstances from which a jury could reasonably infer by Northeast's words, actions or conduct that it agreed to undertake any contractual commitment to Mr. Brown. In his deposition, Mr. Brown could not even say with definiteness whether he had ever seen the FFDM prior to the incident:

Q: Do you recall ever seeing a fitness for duty manual at Millstone prior to October 28th, 1996?

A: Perhaps. I'm not sure. I couldn't say. Probably, yes.

Brown Dep. at 104. (Def.'s Ex. 15).

While Connecticut has recognized a personnel manual may under certain facts and circumstances constitute an implied contract of employment, *see Barry v. Posi-Seal International, Inc.,* 36 Conn.App. 1, 3–8, 647 A.2d 1031 (1994); *Gaudio v. Griffin Health Services Corp.,* 249 Conn. 523, 733 A.2d 197 (1999), absent any record of the representations and circumstances related to Mr. Brown's receipt of the manual, there is nothing from which a jury could infer the existence of an implied contract. *See Torosyan v. Boehringer Ingelheim Pharmaceuticals,* 234 Conn. 1, 8, 662 A.2d 89 (1995). Since the mere existence of the fitness for duty manual without more is no basis for finding an implied contract existed between Mr. Brown and Northeast Utilities, the Court grants summary judgment on plaintiff's implied contract claim.

### IV. Negligent Infliction of Emotional Distress

The crux of Mr. Brown's negligent infliction of emotional distress is Northeast Nuclear's revocation of his unescorted access and disclosure of such information on the PADS system without first following the procedures contained in the Fitness for Duty Manual.

Mr. Brown claims that Northeast should have known that its revocation of his unescorted access clearance without conducting a drug test or warning him that if he left, his clearance would be revoked, involved an unreasonable risk of causing emotional distress. In support of his claim, Mr. Brown relies on *Douglas v. Rucci,* 1998 WL 470588 (Conn.Supp.1998) denying defendant's motion to strike the employee's

negligent infliction of emotional distress claim based on the allegation that the employer had lied about the employee in indicating on a form submitted to the state unemployment office that the employee had engaged in felonious conduct. However, *Douglas* is distinguishable since, as Mr. Brown recognizes, "instead of lying to another entity, Defendant lied here to Mr. Brown by failing and refusing to live up to the expectations it created and stated in the fitness for duty manual." Pl.Opp. at 14 [doc. # 47]. Here, there is no claim that Northeast Utilities lied in reporting its belief, albeit an allegedly erroneous belief, that Mr. Brown refused to take the drug test and therefore revoking Mr. Brown's security clearance.

■ In order to prevail on a claim for negligent infliction of emotional distress, the plaintiff must prove that "the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that distress, if it were caused, might result in illness or bodily harm." *Parsons v. United Technologies Corp.*, 243 Conn. 66, 88, 700 A.2d 655 (1997) (internal citations omitted). "There can be no actionable negligence, however, unless there exists a cognizable duty of care." *Waters v. Autuori*, 236 Conn. 820, 826, 676 A.2d 357 (1996). Generally in negligence, a duty of care may arise from a contract, a statute, or circumstances under which a reasonable person, knowing what the defendant knew or should have known, would anticipate that harm of the general nature as that suffered was likely to result from his act or failure to act. *Coburn v. Lenox Homes, Inc.*, 186 Conn. 370, 375, 441 A.2d 620 (1982). Mr. Brown focuses on the foreseeability of his emotional distress, claiming that defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress when it failed to follow its procedures regarding drug tests before revocation of his security clearance. The

simple fact that Mr. Brown's emotional distress might have been foreseeable to defendant does not dispose of the matter, however, because as the Connecticut Supreme Court noted in *Autuori*, foreseeability is not the fulcrum of a legal duty. *Id.* at 826, 676 A.2d 357. "A further inquiry must be made, for we recognize 'that "duty" is not sacrosanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection.'" *Jaworski v. Kiernan*, 241 Conn. 399, 404, 696 A.2d 332 (1997), *quoting* W. Prosser & W. Keeton, Torts (5th Ed.1984) § 53, p. 358. Whether a duty of care exists is a question of law to be decided by the court. *Shore v. Stonington*, 187 Conn. 147, 151, 444 A.2d 1379 (1982).

■ Defendant's failure to follow the procedures outlined in the FFDM, which gave rise to no contractual rights or obligations between the parties, is not evidence of any identifiable legal duty owed to Mr. Brown or breached by defendants, and plaintiff has not identified any statute imposing such a duty. Nor does the simple allegation of foreseeable harm suffice to save plaintiff's claims from summary disposition, without any evidence that defendant's conduct in acting on the guard's report was unreasonable, given the federal requirement that nuclear facilities must take corrective action to investigate workers suspected of using alcohol. *See Malik v. Carrier Corp.*, 202 F.3d 97, 105 (2d Cir.2000) (rejecting employee's negligent infliction of emotional distress claim based on employer's reasonable corrective action investigating claims of sexual harassment concluding "corrective actions that a risk-averse employer might take to comply with federal law may not give rise to a negligence action, whether the rationale is couched in terms of breach, legal duty or privilege.") Accordingly, summary judgment shall enter in Northeast Nuclear's

favor with respect to Mr. Brown's claim for negligent infliction of emotional distress.

## V. False Light Claim

Mr. Brown claims that Northeast Nuclear's report of its revocation of his unescorted access to the Millstone Facility on the PADS without justification, willfully and knowingly placed him in false light before prospective employers.

■ To establish invasion of privacy by false light, the plaintiff is required to show that "(a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." Restatement (Second), Torts § 652E; *see Goodrich v. Waterbury Republican–American, Inc.,* 188 Conn. 107, 127, 448 A.2d 1317 (1982); *Honan v. Dimyan,* 52 Conn.App. 123, 133, 726 A.2d 613 (1999).

In its motion for summary judgment, Northeast Nuclear contends that 1) plaintiff's evidence fails to show it had knowledge or acted in reckless disregard as to the falsity of the information, 2) Northeast never "widely publicized" any defamatory information about Mr. Brown's revocation; and 3) that even if Plaintiff has demonstrated a supportable claim of false light, such publication was privileged since federal regulations mandate that nuclear utilities share such information and to otherwise impose tort liability under these circumstances would undermine compliance with these federal regulations.

■ Northeast Utilities' claim that Mr. Brown fails to demonstrate that his revocation was "widely publicized" by placement on the PADS system is unavailing, since plaintiff's evidence is that such information was disseminated to at least two prospective employers, which could be found to satisfy the publication requirement. However, Mr. Brown has not identified any facts that show that Northeast knew that the published material concerning Mr. Brown was false or that it published the material with reckless disregard for its falsity. Other than Mr. Brown's allegation that "Defendant knew there was no justification for having done so," Pl.Opp. at 17, there is nothing in this record on summary judgment demonstrating that Northeast had a basis for entertaining any serious doubts as to the truth of the publication or had any reason to believe that the material was false in any respect. Northeast's failure to credit Mr. Brown's account of his interaction with Mr. Williams may have been incorrect or even negligent, but it is insufficient to show a reckless disregard for the falsity of the material it caused to be listed on the PADS system. Therefore, the defendant's motion for summary judgment may be granted on this basis.

■ Additionally, however, the Court agrees with Northeast Utilities that absent any showing of bad faith, plaintiff's false light claim would directly conflict with the federal regulations which required Northeast to identify those persons denied unescorted access and the circumstances of their denial in response to contractor inquiries supported by the individual's signed release. *See* 10 C.F.R. § 26.27(a)(3)

> If [the person who seeks access was denied unescorted access at any other nuclear power plant] the new assignment to activities within the scope of this part or granting of unescorted access must be based upon a management and medical determination of fitness for duty and the establishment of an appropriate follow-up testing program, provided the restrictions of paragraph (b) of this section are observed. To meet this requirement, the identity of persons de-

nied unescorted access or removed under the provisions of this part and the circumstances for the denial or removal, including test results, will be made available in response to a licensee's, contractor's or vendor's inquiry supported by a signed release from the individual.

While the federal regulations do not mandate or mention the creation of the PADS system, the information system was created by utilities in order to comply with the federal regulatory requirements. In opposition to this motion, Mr. Brown does not dispute that Northeast Utilities's disclosure of its revocation of Mr. Brown's security access to the two other plants via the PADS system was otherwise in full compliance with the federal regulations, *i.e.* in response to an inquiry supported by a signed release by Mr. Brown. Accordingly, to impose tort liability for defamation based on the disclosure permitted and required under federal law, absent bad faith, where Northeast Utilities was otherwise attempting to comply with federal regulations would undermine the federal regulatory scheme designed to ensure public safety in this highly regulated field.

### Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment [doc. # 40] is GRANTED. Accordingly, the Clerk is directed to close this case.

IT IS SO ORDERED.