[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
In this case, plaintiff Robert Stapleton, a sworn officer of the Hartford (CT) Police Department, seeks to recover money damages from defendants Monro Muffler, Inc. ("Monro") and Mark Cross ("Cross") for intentional infliction of emotional distress. The claim arises from events which occurred on August 14, 1997 when defendant Cross, then the assistant manager of defendant Monro's Glastonbury, Connecticut store, contacted the Glastonbury Police Department to report that the plaintiff, who was assertedly intoxicated, had just sped away from the Monro parking lot after engaging in an angry argument about the servicing of his vehicle inside the store. As a result of Mr. Cross's complaint, which the plaintiff claims to have been an "extreme and outrageous" response to his frustrated efforts to get proper warranty service for his vehicle, the plaintiff alleges that he suffered "severe" emotional distress, in that "he was humiliated and embarrassed in front of his colleagues, the Glastonbury Police and the Connecticut State Police; and was humiliated in that a state trooper came to his home while he was having a party." Revised Complaint (2/6/01), Count VI, ¶¶ 17, 19.
To prevail on a claim of intentional infliction of emotional distress, four elements must be established.
 "It must be shown: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe . . . Petyan v. Ellis, 200 Conn. 243, 253, 510 A.2d 1337 (1986)." (Internal quotation marks omitted.) Appleton v. Board of Education, 53 Conn. App. 252, 265, 730 A.2d 88, cert. granted on other grounds, 249 Conn. 927, 733 A.2d 847 (1999). "Liability for intentional infliction of emotional distress requires conduct exceeding all bounds usually tolerated by decent society, of a nature which is CT Page 1797 especially calculated to cause, and does cause, mental distress of a very serious kind." Ancona v. Manafort Bros., Inc., 56 Conn. App. 701, 712, 746 A.2d 184, cert. denied, 252 Conn. 954, 749 A.2d 1202 (2000).
Muniz v. Kravis, 59 Conn. App. 704, 708, 757 A.2d 1207 (2000) (emphasis added). The defendants have now moved this Court for summary judgment on the ground that the plaintiff cannot establish the fourth essential element of intentional infliction of emotional distress, to wit: that the mental suffering he endured as a result of the defendant's alleged misconduct was of such a "very serious kind" as to constitute "severe emotional distress."
 I
To prevail on their motion, the defendants must show, based on the pleadings, affidavits and other materials submitted in support of and in opposition to the motion, that there is no genuine issue of material fact that the plaintiff did not suffer "severe emotional distress" as a result of their alleged misconduct, and thus that they are entitled to judgment as a matter of law. Practice Book § 17-49; Gurliacci v. Mayer,218 Conn. 531, 562 (1991). In making its determination as to the sufficiency of the defendants' showing, the Court must view the evidence in the light most favorable to plaintiff. Catz v. Rubenstein, 201 Conn. 39,49 (1986).
 II
In support of their motion, the defendants have supplied the Court with a lengthy excerpt from the transcript of the plaintiff's deposition, in which the plaintiff fully described the nature of the defendants' alleged misconduct and its claimed effects upon him. In light of that description, which the plaintiff has not modified or supplemented in responding to the motion, the plaintiff's claim that the defendants caused him severe emotional distress is based on the following facts.
On August 14, 1997, the plaintiff left work at the Hartford Police Department shortly after 5:00 p.m. and drove to Monro's store in Glastonbury to have new calipers installed on his car. Having ordered the new calipers under his Limited Lifetime Warranty on or about August 8, 1997, he had made several unsuccessful attempts to have them installed in the intervening week.
After dropping off his car at about 5:20 p.m., the plaintiff walked across the street to a restaurant, The Ground Round, where he ate some chicken wings and drank about half of a 12-ounce beer. He returned to CT Page 1798 Monro at about 5:50 p.m. after calling and being told that his car was ready.
On returning, however, the plaintiff was told once more that his car had not been repaired. Given no answer by defendant Cross when he demanded to know why, the plaintiff then demanded that Cross give him both the name of his district representative and a written list of the names of all Monro employees who were then in the store. The plaintiff's stated purposes for making these demands were to get the name of a person to whom he could make a complaint and to get written proof that he had actually been in the store at the time in question. After giving him "two or three minutes of the run around," defendant Cross told the plaintiff that Monro couldn't fix his car and refused to comply with his demands for names. According to the plaintiff, who described himself as "angry," he left the store at about 6:00 p.m., got in his car, and drove straight home to Hebron, where a fellow Hartford officer whom he had invited over to dinner was already waiting for him.
About a half-hour after the plaintiff arrived home, a Hebron constable named Officer Gervais "showed up" in his driveway and told him that the Glastonbury Police were reporting an incident in which an intoxicated driver, identified as the plaintiff, had been very loud and angry and caused a scene in Monro's lobby, then sped off from the parking lot. Upon being so informed, the plaintiff suggested to Officer Gervais that they call the Glastonbury Police Department, which they then did, speaking to Commander Cordone. Commander Cordone advised the plaintiff and Officer Gervais that he would have the investigating officer call them at the plaintiff's house.
In the fifteen or twenty minutes before the investigating officer called, the plaintiff spoke to Officer Gervais, who was affiliated with the Connecticut State Police. He recounted what had happened at the Monro store that afternoon after his week-long wait for warranty service that was never performed. According to the plaintiff, Officer Gervais was "disgusted" by what he was told, informed the plaintiff that defendant Cross's complaint was "nonsense," and stated that he didn't have time to deal with such matters. He did not give the plaintiff a breathalyzer test or require him to undergo any field sobriety tests.
When the Glastonbury officer called, the plaintiff related his version of the incident once again and insisted it be included in the police report. He noted specifically that he had been frustrated in his earlier efforts to have his car serviced and that defendant Cross's statement that he had arrived at the store at 4:30 p.m. was provably wrong, based on Hartford Police Department time records. CT Page 1799
After the plaintiff spoke with the Glastonbury officer, Officer Gervais left his house. Shortly thereafter, his guest, Officer Dellaripa, left too. According to the plaintiff, Officer Dellaripa "couldn't believe" what had happened, and neither could the plaintiff's wife, who is the daughter of a police officer who died in the line of duty in 1979.
On the evening of the incident, the plaintiff couldn't eat his meal. As a consumer who had merely tried to get proper service for his car, he couldn't believe that defendant Cross had called the police and accused him of criminal conduct.
Later that evening, the plaintiff reported the incident to his own commander, Lieutenant Donovan, as required by Departmental policy. As the plaintiff described it at his deposition, his conversation with Lieutenant Donovan was completely uneventful, and has had no adverse consequences of any kind. Hence, though he worries that the incident may one day affect his ability to transfer within the Department, he has no evidence that it has ever done so. Indeed, the plaintiff does not even know if the Glastonbury police report was ever placed in his personnel file.
The day after the incident, the plaintiff telephoned Lieutenant Johnson of the Internal Affairs Division of the Glastonbury Police Department to express concern that his version of the incident might not have been included in the Glastonbury police report because the investigating officer had told him that "it didn't matter." Lieutenant Johnson's only response to this call was to say that he had talked about the incident to Commander Cordone, who had "said it was all done with."
Subsequent to the incident, the plaintiff claims that "a couple of officers" made "very negative" comments to him about the incident. He cannot remember, however, who these officers were, what departments they worked for or what exactly they said. Indeed, when he was pressed for details as to these comments at his deposition, all the plaintiff could say was that on occasion he personally had described the incident to other officers:
 Q. Go ahead. If you want to say something, this is your chance. What was the nature of the comment? I understand that you're saying your integrity — give me a sense of what was said.
 A. Well, like I said, I can't name specifics, but there were instances. Like I told you, it is a tightknit family and things got around. Sure I told officers about that incident only because I don't want them to go through the same thing that I went through. Here I am I CT Page 1800 just want to get my brakes fixed.
Depo., pp. 41-42.
The plaintiff never sought medical or psychological treatment of any kind as a result of the incident. In fact, as he explained at his deposition, in the following colloquy with defense counsel, the only effects the incident had on his daily life were a temporary loss of appetite and disruption of his sleep:
 Q . . . As a result of what happened with Monro Muffler, what other consequences to your daily life have occurred that we haven't already discussed?
 A. Like I said, it was very upsetting that day that they took it this far.
 Q. You mentioned that you weren't able to eat your meal that night when it happened.
 A. Over several days my appetite wasn't the same and I had trouble sleeping as well.
Q. For how long?
 A. For about two weeks.
Q. How long was your appetite not the same, you said several days?
 A. Well, it takes a while when you're upset like that. For approximately two weeks.
 A. For about two weeks.
Q. And you had trouble sleeping for two weeks?
 A. Yes. Q. But you never sought any treatment, any sort of medical or psychological treatment for the sleep or the lack of appetite?
 A. No.
Depo., pp. 42-43. CT Page 1801
 III
Though our appellate courts have clearly stated that "severe emotional distress" is "mental distress of a very serious kind"; see, e.g., Munizv. Kravis, supra, 59 Conn. App. at 708; they have never announced a bright-line test for determining which kinds of mental distress are sufficiently serious to qualify as "severe emotional distress." Even so, they have consistently held that the determination "[w]hether . . . the plaintiff's . . . distress [is] sufficient to satisfy . . . the [fourth and final element of intentional infliction of emotional distress] is a question, in the first instance, for [the] court." See, e.g., Ancona v.Manafort Bros., Inc., supra, 56 Conn. App. at 712. "Only where reasonable minds can differ," the Appellate Court has stated, "does [the plaintiff's claim of `severe emotional distress'] become an issue for the jury." Bellv. Board of Education, 55 Conn. App. 400, 410, 739 A.2d 321 (1999) (quoting Mellaly v. Eastman Kodak Co., 42 Conn. Sup. 17, 18-19,597 A.2d 846 (1991) (Berdon, J.), and citing 1 Restatement (Second), Torts § 46, comment (j)).[1]
To resolve this issue in particular cases, Connecticut trial courts have frequently relied upon the language of comment (j) to Restatement (Second) § 46, which defines "severe emotional distress" as distress that "no reasonable [person] could be expected to endure . . ." 1 Restatement (Second) of Torts § 46, comment (j). In Mellaly v.Eastman Kodak Co., supra, 42 Conn. Sup. at 21, for example, Justice (then Judge) Berdon invoked comment (j) as follows in support of his conclusion that the plaintiff's complaint should not be stricken because it sufficiently pleaded severe emotional distress:
 Likewise, the emotional distress alleged by the plaintiff is sufficient. It is alleged, in part, that as a result of [the defendant]'s conduct, the plaintiff became depressed, lost sleep, suffered from anxiety attacks, stress and felt physical pain, including high blood pressure, and suffered from rashes, skin problems and a swollen face as a result of anxiety. Proof under these allegations could reach the required level of distress which "no reasonable [person] could be expected to endure . . ." 1 Restatement (Second) of Torts § 46, comment (j).
Similarly, in Blouin v. Blouin, No. CV89 0295774S (Jan. 17, 1992, J.D. of New Haven) (Healey, J.T.R.), retired Justice Healey, then sitting as a Judge Trial Referee, cited comment (j) as follows for the proposition that
"Severe emotional distress means, . . . emotional distress of such CT Page 1802 substantial quantity or enduring quality that no reasonable man in a civilized society should be expected to bear it." Fletcher v. Warton National Life Insurance Co., 89 Cal.Rptr. 78, 90 (1970); see Restatement (Second) of Torts [§ ]46, comment j.
Accord, Gilman v. Gilman, 46 Conn. Sup. 21, 23 (1999) (Hurley, J.T.R.) ("the plaintiff's emotional distress . . . must be sufficiently severe and extreme that no reasonable person should be expected to endure it");Forsythe v. Ambrogio, No. CV 97-0404059S (Jun. 28, 2001),2001 Ct. Sup. 8756 (Lager, J.) ("[E]motional distress is severe where it reaches a level which no reasonable person could be expected to endure" (internal quotation marks omitted; internal citation omitted).).
Though our appellate courts have not yet adopted the definition of "severe emotional distress" that appears in comment (j), there are two compelling reasons to believe that they will do so when the issue is presented for their decision. First, ever since Connecticut courts first recognized the tort of intentional infliction of emotional distress, they have been guided in their identification, interpretation and enforcement of its essential elements by the language of Restatement § 46. SeeHiers v. Cohen, 31 Conn. Sup. 305, 308-11, 329 A.2d 609 (1973) (first recognizing the tort of intentional infliction of emotional distress in Connecticut, but sustaining a demurrer to the plaintiff's claim for failure to plead all of its essential elements, as set forth in the Restatement); Murray v. Bridgeport Hospital, 40 Conn. Sup. 56, 62,480 A.2d 610 (1984) (identifying and describing the essential elements of intentional infliction of emotional distress on the basis of the Restatement); Petyan v. Ellis, 200 Conn. 243, 253, 510 A.2d 1337 (1986) (acknowledging that intentional infliction of emotional distress had been recognized in Connecticut since Hiers, and stating that Murray "provides appropriate guidelines for determining whether a successful cause of action will lie"). In so doing, moreover, our courts have regularly looked to the official commentary to Restatement § 46 for guidance as to how particular elements of that cause of action should be interpreted and applied. See, e.g., Petyan v. Ellis, supra, 200 Conn. at 254-55
(examining comment (g) on the issue of privilege); and Appleton v. Boardof Education of Stonington, 254 Conn. 205, 210, 757 A.2d 1059 (2000) (examining comment (d) as to the type of conduct that is actionable as intentional infliction of emotional distress). Of special note in this regard is Bell v. Board of Education, 55 Conn. App. 400, 410, 729 A.2d 321
(1999), where the Appellate Court expressly relied on comment (j) — the comment here at issue — in determining that the existence of severe emotional distress is a question, in the first instance, for the court. Against this background, there is strong reason to believe that our Supreme and Appellate Courts will be guided by CT Page 1803 comment (j) in defining "severe emotional distress" for the purpose of intentional infliction of emotional distress.
The second reason why our Supreme and Appellate Courts are likely to use the analysis in comment (j) to distinguish between "very serious kind[s]" of mental distress, which are actionable as intentional infliction of emotional distress, and less serious kinds of mental distress, which are not, is that their own prior decisions on this subject suggest the same dichotomy between cases that do and do not involve "severe emotional distress." On the one hand, the courts have made it clear that "[c]onduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress." (Citation omitted; internal quotation marks omitted.) Appleton v. Board of Education, 254 Conn. 205, 210-11,757 A.2d 1059 (2000). Similarly, the Appellate Court has held that mere embarrassment or humiliation — indeed, even great humiliation — is an insufficient basis for claiming that one has suffered "severe emotional distress." Barry v. Posi-Seal International, Inc.,36 Conn. App. 1, 19 n. 17, remanded for further consideration on othergrounds, 235 Conn. 901, 664 A.2d 1124 (1995) (affirming the trial court's decision to set aside a plaintiff's verdict for intentional infliction of emotional distress because the "plaintiff's testimony . . . that [her] discharge [from employment] was embarrassing and humiliating [wa]s not sufficient to indicate emotional distress — severe emotional distress"); Drew v. K-Mart Corp. , 37 Conn. App. 239, 252, 655 A.2d 806
(1995) (affirming the trial court's directing of a verdict on the claim of intentional infliction of emotional distress due to insufficient evidence that the plaintiff, who testified that she was "greatly humiliated" by the defendant's actions, had suffered "severe emotional distress"). The tenor of these decisions is that common feelings and emotions, such as hurt feelings, embarrassment and humiliation, are things we all experience in our daily lives, and thus things we must learn to live with if we are to live together in contemporary society. They do not, for that reason, reach the level of distress which "no reasonable [person] could be expected to endure . . ." 1 Restatement (Second) of Torts § 46, comment (j).
On the other end of the spectrum, the Appellate Court has declared that certain forms of mental suffering are so extreme and serious that no reasonable person should ever be expected to put up with them. The best example of such an intolerable form of suffering, as discussed in an Appellate Court decision, is that described in Bell v. Board ofEducation, supra, 55 Conn. App. at 410-12. There, the plaintiffs claimed that the defendant's educational policy had affirmatively encouraged, CT Page 1804 created and tolerated an atmosphere of chaos, disruptiveness and violence in their children's school, that their children had been exposed to physical and verbal violence, and that the school had become a place of fear for them, where learning could not and did not take place over a two-year period. The plaintiffs claimed that this policy had caused their children to suffer extreme emotional distress.
Noting that the defendant had conceded the sufficiency of the plaintiffs' allegations of severe emotional distress, the Appellate Court ruled as follows that the trial court had erred in striking their claim:
 It is impossible to conceive that children would not be peculiarly susceptible to violence, especially under the alleged facts of this case. We can think of no reason why our society could or should countenance or suffer this type of conduct in a place of learning. We conclude that the extremely broad allegations . . . of the plaintiffs' complaint, not addressed by any request to revise filed by the defendants, were sufficient to establish a cause of action sounding in intentional infliction of emotional distress, which should not have been stricken from the complaint.
Id. at 412.
The significance of this ruling for present purposes is its consistency with the analysis suggested in comment (j) to Restatement (Second) § 46. It confirms, more particularly, that "severe emotional distress" involves great mental suffering of a kind and/or duration that our society does not countenance and that no reasonable person could be expected to endure. Only such intolerable, unbearable forms of suffering, as distinguished from embarrassment, humiliation, hurt feelings and other less debilitating, more transient forms of suffering, can serve as lawful bases for imposing liability for intentional infliction of emotional distress.
Applying the analysis of comment (j) to the present case, it is clear beyond question that the plaintiff's only suffering was so mild and short-lived as not to constitute "severe emotional distress" as a matter of law. By his own description of the events of August 14, 1997 and their aftermath, all the plaintiff suffered as a result of the defendants' alleged actions were: (1) short-term embarrassment in front of certain fellow police officers, Officer Gervais, Officer Dellaripa, Lieutenant Donovan, and the three Glastonbury officers who spoke with him thereafter; (2) worry that the Glastonbury Police report might not include his version of the underlying incident at the Monro store; (3) a two-week period of changed appetite and difficulty sleeping after the CT Page 1805 incident; and (4) concern that his reputation and career prospects may have been damaged by reports of the incident. Examined more closely, each of these claims, if founded at all, is de minimis at best.
The plaintiff's claimed embarrassment before Officer Gervais was at most very abbreviated, for by the plaintiff's own account, Officer Gervais immediately accepted his version of the underlying incident, dismissed the defendant's complaint as utter nonsense, and treated it accordingly. Declining to investigate the plaintiff for driving under the influence of alcohol, though he easily could have in view of the contents of the defendant's complaint, Officer Gervais was respectful of the plaintiff at all times and followed his suggestion to call the Glastonbury Police Department rather than taking him into custody or treating him like a suspect.
The plaintiff had even less reason to feel embarrassed in front of Officer Dellaripa, his fellow Hartford Police officer and dinner guest on the evening in question. According to the plaintiff, Officer Dellaripa told him that he couldn't believe what he had been told about the incident. Officer Dellaripa thereby commiserated with the plaintiff and clearly suggested that the defendant had been wrong to report him to the Glastonbury Police. The plaintiff does not claim that his relationship with Officer Dellaripa was affected by the incident in any way.
As for the plaintiff's commanding officer, Lieutenant Donovan, the plaintiff's only contact with him about the incident was in a routine telephone report later that evening. According to the plaintiff, the telephone report involved only the retelling of his version of the incident and the Lieutenant saying "Okay." Neither man ever followed up on the report in any way, and the plaintiff never inquired if the Glastonbury Police report was ever placed in his personnel file.
Finally, as for members of the Glastonbury Police Department with whom the plaintiff spoke — Commander Cordone, the investigating officer and Lieutenant Johnson of the Internal Affairs Division any embarrassment before them was minimal at most in light of their quick and very favorable response to his version of the underlying incident. The Commander treated him respectfully, complying with his request that the investigating officer call him at home instead of having him come to the Glastonbury Police Department. The investigating officer promptly made the call, as requested, listened to the plaintiff's version of the incident, and determined that no further investigation or enforcement activity was called for. Therefore, though the plaintiff was concerned that his version of the incident might not be fully set forth in the Glastonbury police report, all three Glastonbury officers determined that CT Page 1806 the incident was over, and that inclusion of his version in a file that was going nowhere was unnecessary. Hardly cause for embarrassment, the plaintiff's interactions with the Glastonbury officers no doubt contributed significantly to the matter not being further pursued.
As a result of the incident, the plaintiff claims that he had trouble eating and sleeping for about two weeks. He never received medical or psychiatric treatment or counseling for any problem or condition arising from these reported difficulties, never took any medications for such a problem or condition, and had no other adverse consequences as a result of the incident except for his lingering worry that even now, over five years after the incident, his career path within the Hartford Police Department may one day be impeded as a result of the incident.
The latter suggestion, however, is rank speculation, unfounded in any way. Here again, it is worthy of note that the plaintiff has never sought to examine the contents of his personnel file to determine if the Glastonbury police report was ever put in there. Accordingly, he has no knowledge whether or not, and if so how, the incident and his report concerning it are referenced in that file. If such unfounded worries could form the basis for a claim of intentional infliction of emotional distress, every police officer who was ever made the subject of an unsuccessful citizen's complaint could later bring an action for intentional infliction of emotional distress. Surely, putting up with the complaints of citizens is not a type of stress that is so great and intolerable that no reasonable person could be expected to endure it.
The plaintiff's final suggestion is that on occasion, other officers have made negative comments to him about the incident. Though he cannot identify these other officers, remember what department(s) they worked for, or recall exactly what they said, he does claim to remember that they did make comments which were "very negative." Assuming that such comments were indeed made, it is clear that the impression they made upon the plaintiff was neither indelible nor long-lasting. When pressed for details on the subject at his deposition, he described conversations with brother officers in which he complained about the defendants' conduct towards him in an effort to warn his interlocutors about the defendants. No such conversation is claimed to have harmed his relationship with any other officer in any way. None, moreover, is claimed to have given him even one sleepless night or bout of diminished appetite, for such problems all ended, by his own description, within two weeks of the incident.
Conclusion CT Page 1807
Intentional infliction of emotional distress requires proof, interalia, of severe emotional distress. Severe emotional distress is mental distress of a very serious kind— the sort of distress which "no reasonable [person] could be expected to endure . . ." 1 Restatement (Second) of Torts § 46, comment (j).
A police officer's reputation for honesty, good judgment and fair mindedness is vitally important to him, and for good reason. His ability to perform his official duties effectively and efficiently depends directly upon it. When an officer's reputation is called into question, his disquiet is surely understandable. Indeed, if a challenge to his reputation did not cause him distress, his reaction would be curious indeed.
Even so in the rough and tumble life of our open society, persons charged with public responsibilities are always subject to careful scrutiny, and often to criticism, some of it harsh and unfounded. Such scrutiny and criticism are fostered and encouraged to ensure that those who exercise important public functions are truly capable of performing their jobs as they should. The ultimate corrective for unfounded criticism of a public servant is informed and open public debate that exposes the truth. Hence, public officers must generally be prepared to live with criticism directed at them, confident that if they have conducted themselves properly, their reputations will be preserved by the free exchange of conflicting facts and views.
Against this background, a police officer's understandable mental distress when he is wrongly criticized is typically not distress of a kind that no reasonable person could be expected to endure. More than most people, a police officer must be prepared to put up with such criticism, confident that his fellow citizens, both as individuals and through the institutions of society, will afford him every reasonable opportunity to be heard and set the record straight. Only in rare cases, where the wrongful criticism is particularly extreme and outrageous, and its effects upon the officer are beyond the capacity of any reasonable person in his situation to endure, can an officer attacked in such a manner show that his suffering amounts to "severe emotional distress."
The plaintiff in this case has not made such a showing. His embarrassment was minimal, as everyone who learned of what had happened to him rallied around him without hesitation or delay. The defendant's complaint was not pursued by any police department for any purpose. And, in the end, all it cost the plaintiff, besides unfounded worries about his career, was two weeks of diminished appetite and poor sleep. Because such consequences do not constitute severe emotional distress as a matter CT Page 1808 of law, the defendants' Motion For Summary Judgment must be granted.
IT IS SO ORDERED this 3rd day of February 2003.
Michael R. Sheldon, J.